961 A.2d 1219 (2009)
404 N.J. Super. 401
PAN CHEMICAL CORP., Plaintiff-Respondent,
v.
HAWTHORNE BOROUGH, Defendant-Appellant.
DOCKET NO. A-4779-06T1.
Superior Court of New Jersey, Appellate Division.
Submitted November 17, 2008.
Decided January 7, 2009.
*1220 Law Offices of Michael J. Pasquale, Hawthorne, for appellant (Mr. Pasquale, on the brief).
Harry Haushalter, Hamilton Square, for respondent.
Before Judges CARCHMAN, R.B. COLEMAN and SABATINO.
The opinion of the court was delivered by
R.B. Coleman, J.A.D.
The Borough of Hawthorne (the Borough) appeals a Tax Court order in favor of plaintiff Pan Chemical Corporation (Pan Chem), for a reduction in property taxes for consecutive years 2000 through 2005 on a contaminated parcel of land owned by Pan Chem.
The parcel of land in dispute is located at One Washington Street in the Borough of Hawthorne, Block 2801, Lot 1. The property is located in the I-1 industrial zone of the Borough and consists of approximately 1.407 acres and seven buildings comprising approximately 26,940 square feet. The property had an assessed value as to land and improvements of $1,073,500 for the subject tax years. The parcel is triangular in shape with one side fronting Washington Avenue. The remaining two sides are bound by railroad *1221 tracks. This is relevant because the geographic layout ultimately led to the closure of the plant due to the limited growth potential of the manufacturing facility. Prior to 1999, Pan Chem had occupied the property for fifty-five years for the purpose of the manufacture of industrial coatings, color dispersions, inks and nail polish. In 1992, Pan Chem removed underground storage tanks which had leaked chemicals that contaminated the soil and ground water. Pan Chem has since maintained monitoring wells in compliance with the direction of the New Jersey Department of Environmental Protection (DEP).
In October of 1999, Pan Chem moved its manufacturing operations and thirty-plus employees to Carlstadt. It left only three employees on the subject property and two of its seven buildings in use. The president of Pan Chem, Robert Rossamondo, testified that the reason the manufacturer did not shut operations down completely on the property was to avoid or postpone costly environmental clean-up pursuant to its legal obligation under the Industrial Site Remediation Act (ISRA), formerly the Environmental Cleanup Responsibility Act (ECRA). N.J.S.A. 13:1K-6 to -14. The manufacturer conceded it made no efforts to improve or maintain the property, other than removal of the leaking storage tanks. Pan Chem sold the property in 2005 for $150,000 in "as is" condition, with the purchaser assuming all environmental cleanup costs.
Subsequently, Pan Chem filed with the Borough tax appeals for each tax year from 2000 through 2005. The appeals were heard by the Tax Court on June 28, November 6, 8, and 9, 2006. The Tax Court consolidated the matters for trial and issued its oral decision on January 12, 2007, in favor of a tax reduction for Pan Chem. The Tax Court found the buildings on the site to be in substantial disrepair as to each of the valuation dates. However, the Tax Court requested a revised appraisal valuation regarding the "entrepreneurial incentive." Upon receipt of the revised valuation report, the Tax Court issued a supplementary letter opinion on February 22, 2007, with a finalized deduction schedule for environmental clean-up costs and reduced assessment valuations for the tax years at issue. On March 23, 2007, final judgments were entered for each year under appeal. The Borough filed a notice of appeal with this court on May 4, 2007.
In reviewing Tax Court decisions on appeal, we generally defer to the expertise of the Tax Court in this specialized, complex area. Reck v. Dir., Div. of Taxation, 345 N.J.Super. 443, 446, 785 A.2d 476 (App.Div.2001), aff'd, 175 N.J. 54, 811 A.2d 458 (2002). The judges assigned to the Tax Court "`have special expertise, [and] we will not disturb their findings unless they are plainly arbitrary or there is a lack of substantial evidence to support them.'" NYT Cable TV, a Div. of New York Times Co. v. Borough of Audubon, 230 N.J.Super. 530, 534, 553 A.2d 1368 (App.Div.1989) (quoting Kearny Leasing Corp. v. Town of Kearny, 7 N.J.Tax 665, 667 (App.Div. 1985)). However, the findings of the Tax Court Judge must be "supported by substantial credible evidence in the record as a whole." Hackensack Water Co. v. Borough of Haworth, 178 N.J.Super. 251, 259, 2 N.J.Tax 303, 428 A.2d 934 (App.Div. 1981).
In tax assessment cases, it is well established that "exemptions from the general property tax scheme will be construed against exemption, and that the party claiming exemption must bear the burden of proof demonstrating entitlement to the exemption." Twp. of Monroe v. Gasko, 182 N.J. 613, 620, 868 A.2d 1022 (citing Princeton Univ. Press v. Borough of *1222 Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961)).
No party to this action disputes that the resale value of the property at issue has been adversely impacted by soil and groundwater contamination. The Borough contends, however, that at no point during the time in question (tax years 2000 to 2005) did the contamination prevent or preclude the manufacturer from full use of its property. The record shows that Pan Chem did, in fact, use the site, albeit at a fifteen percent capacity, until the property was sold "as is" in 2005.
In determining true market value for taxation purposes, appraisers are advised to view contaminated properties as "special purpose" properties and allow a measure of flexibility to reach a determination of "true value." Inmar Associates, Inc. v. Carlstadt, 112 N.J. 593, 606, 549 A.2d 38 (1988). Inmar is controlling on this issue. There, the Supreme Court instructed that the "methodology for resolving the question is not simply to deduct the cost of the cleanup from a putative value of the property." 112 N.J. at 605, 549 A.2d 38. Just because cleanup costs will adversely affect the owner's profits, it does not automatically entitle the owner to a reduction in its tax assessment. Ibid. "`Mere costliness, therefore, cannot rationally be made the basis of exemption from taxation.'" Id. (quoting CPC Int'l, Inc. v. Borough of Englewood Cliffs, 193 N.J.Super. 261, 268, 473 A.2d 548 (App. Div.1984)).
In 1983, the Legislature enacted the Environmental Cleanup Responsibility Act (ECRA), which mandated the remediation of contaminated properties upon the sale or cessation of business activities upon the property. N.J.S.A. 13:1K-6 to -14. This Act was replaced in 1993 by the Industrial Site Remediation Act (ISRA), which also requires the immediate clean-up of soil contamination when triggered by the sale or cessation of business on the property. Ibid.
Plaintiff contends the partial plant operations on its property are irrelevant and that there is but one issue before this court, namely, whether property that suffers from significant soil and ground water contamination is entitled to have its assessment reduced under the local property tax laws. This contention is somewhat off the mark, however, because the Court in Inmar explicitly made a distinction between contaminated properties in use at the time of valuation and those not in use in any manner:
[T]he property had a distinct "value in use" to the owner so long as the owner continued to operate the facility. Hence, when property is in use, normal assessment techniques will remain an appropriate tool in the appraisal process.
[Inmar, supra, 112 N.J. at 607, 549 A.2d 38.]
The Borough claims its valuation methodology for properties which are still in use at the time of assessment is consistent with Inmar. We address each of these issues in turn.
In Inmar, the Court combined two similar challenges to tax assessments by owners of separate environmentally contaminated parcels of land and reached different results. GAF Corporation operated an asphalt siding plant that was still in use during the tax year assessed. Id. at 596, 549 A.2d 38. Inmar Associates, Inc. (Inmar) owned a 5.9 acre parcel on which sat sixty-seven abandoned chemical storage tanks. Id. at 598, 549 A.2d 38. Inmar had ceased business activities on the land prior to the assessment date. Furthermore, that property had been placed on the Federal Superfund list under the Comprehensive Environmental Response, Compensation, *1223 and Liability Act (CERCLA), 42 U.S.C. §§ 9601 to -9675. Id. at 598, 549 A.2d 38.
At trial, GAF offered an estimate as to cleanup costs; however, no sampling study had been done, nor had a cleanup plan been approved by the DEP. Id. at 597, 549 A.2d 38. Significantly similar to the case at bar, the GAF property had become industrially obsolete, and the facility was to be closed and the land sold. However, at the time of the tax assessment the site was still in use to some degree. Id. at 596, 549 A.2d 38. There, the Court affirmed the Tax Court's finding that no devaluation for contamination applied.
On the other hand, the Court reversed and remanded as to Inmar's property, rejecting the Tax Court's decision not to make an adjustment for environmental contamination because "no firm or fixed obligation to do restoration work had been incurred." Id. at 599, 549 A.2d 38. The Inmar property was not in use as of the assessment date, and the Court found that Inmar had presented sufficient proofs of cleanup costs, even though no cleanup had taken place, nor had the DEP ordered Inmar to clean the property as of the assessment date. Id. at 598, 549 A.2d 38.
In Inmar, the Court distinguished the two properties on the basis of use: GAF was still occupied and in use at the time of the assessment date; the Inmar property was not in use. The Court reasoned, "even though ECRA might have prevented sale of the property on the assessment date, the property had a distinct `value in use' to the owner so long as the owner continued to operate the facility.'" Id. at 607, 549 A.2d 38. "Hence, when the property is in use, normal assessment techniques will remain an appropriate tool in the appraisal process." Ibid.
In Badische Corp. (BASF) v. Town of Kearny, 288 N.J.Super. 171, 672 A.2d 186 (App.Div.1996), we rejected the Tax Court's finding that the subject property was identical to the GAF property in Inmar. There, we concluded that unlike the GAF property, the BASF property was not in use as of the assessment date. Id. at 183, 672 A.2d 186. Notably, BASF had completely closed down its operations and, thus, had triggered the clean-up mandates of ISRA. Id. at 179, 672 A.2d 186. There, we observed that the Tax Court "incorrectly relied upon the GAF case in Inmar in determining whether BASF submitted sufficient proof of the cleanup costs." Id. at 188, 672 A.2d 186.
Rather, we held, "[b]ecause the BASF property was not in use, the principles which were applied to the Inmar property are controlling." Ibid. The factors we considered convinced us that present sufficient proofs had been submitted to warrant a remand. For example, at the time of the assessment, "BASF had submitted a detailed Site Evaluation Submission (SES) to the Department of Environmental Protection (DEP) documenting the environmental history of the subject property." Ibid. "A sampling plan setting forth the method of testing to determine the extent of contamination was submitted and approved by the DEP." Ibid. "Soil and groundwater testing were substantially complete, and some results were available enabling BASF to estimate the amount of contamination and the cost of cleanup...." Ibid. Furthermore, BASF had established a $10 million reserve to cover the clean-up costs. We commented that "[t]hese proofs at least equal, if not surpass, those submitted by Inmar and found by the New Jersey Supreme Court sufficient to warrant remand." Ibid. We remanded the BASF case, instructing the Tax Court to adjust the assessed value of the subject property downward due to environmental contamination.
*1224 Earlier, in University Plaza Realty Corp. v. City of Hackensack, 264 N.J.Super. 353, 624 A.2d 1000 (App.Div.1993), we had addressed "value in use" to the owner of contaminated property and made a distinction between voluntary contamination abatement and legally-mandated remediation. University Plaza presented a different kind of determination in "evaluating market impact of adverse property conditions which are subject to discretionary correction." Id. at 358, 624 A.2d 1000 (concerning market impact of asbestos contamination on leasing space and resale of property). There, we explained that properties such as GAF, which were subject to expensive cleanup costs were they to be sold, could alternatively "be continued in profitable use indefinitely by merely avoiding changes in use or ownership." Id. at 357, 624 A.2d 1000. We recognized that "[g]ranting tax relief in such cases could provide a windfall tax benefit to the very persons responsible for toxic conditions, even though no actual clean-up costs are incurred." Id. at 358, 624 A.2d 1000. The Court in Inmar "was understandably concerned with arriving at proper methods to accommodate the constitutional demand for true value assessment in those unique cases." Ibid. (internal citations omitted).
Here, plaintiff concedes it kept a bare minimum of continued operations and employees working on the premises in order to avoid "closed operations" status and, thus, avoid triggering the cleanup mandates of ISRA. The president so testified:
A: We took the equipment with us over the period from 1995 to '98, '99, when we got operating in Carlstadt.
Q: Okay, so
A: We did leave some equipment, but the equipment that we left was not anything that worked.
Q: Right. Why did you not have a total shutdown as of October '99?
A: Because according to law, we're under an ESRA one investigation and if we closed more than 90 percent of the facility, we would trigger ESRA number two notification and we would have to clean the facility, so we intentionally kept 15 percent of our production here to comply with ISRA.
It therefore appears that Pan Chem would have it both ways. It wanted the property to be deemed "in use" during the years on appeal for the sole purpose of avoiding the costly cleanup mandated by ISRA. Now, Pan Chem wants the property to be deemed "not in use" over the same period of time in order to claim a reduced tax liability.
The Tax Court made the determination that Pan Chem's property should not be considered "in use" at the time of assessment. Analyzing the case law, the judge decided to treat the property as closed. He said:
If the proper interpretation of the Inmar decision is that for purposes of treatment of environmental clean-up costs in tax appeal proceedings a distinction should be made between properties that continued to operate and those that are closed, then I conclude that the subject property as of each of the valuation dates in issue should be treated as a closed property.
The Tax Judge explained the basis for his decision:
[P]laintiff had moved [its] manufacturing operations to a facility in Carlstadt. It maintained a crew of three employees at the subject property and used only two of the seven buildings at the facility. All manufacturing equipment had been removed from buildings two, three and four.
The subject property was not in operation in the same fashion as the GA *1225 GAF plant described in the Inmar decision appears to have been. Under these circumstances I conclude that the subject property should be treated as a closed, nonoperating facility and not as an open and operating facility under the standards that can be derived from the Inmar decision.
Consequently, even under Inmar as interpreted in Badische, I conclude that the deduction of environmental cleanup costs is appropriate.
We disagree. The record does not contain any further explanation for the determination as to the status of the property. The undisputed evidence was that the property was, in fact, in use. The president of Pan Chem testified they "intentionally kept 15 percent of [their] production [t]here to comply with ISRA." In the face of that frank admission, the Tax Court's legal conclusion is not supported by substantial credible evidence.
There is a presumption that tax assessments made by the proper authority are correct and the burden is on the taxpayer to prove otherwise. Pantasote Co. v. Passaic, 100 N.J. 408, 413, 495 A.2d 1308 (1985) (quoting Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 104-105, 89 A.2d 385 (1952)). The taxpayer cannot meet this burden unless it has presented the reviewing tribunal with "sufficient competent evidence to overcome the presumption, that is, to establish a true valuation of the property at variance with the assessment." Ibid. "In other words, it is not sufficient for the taxpayer merely to introduce evidence: the presumption stands until sufficient competent evidence is adduced to prove a true valuation different from the assessment." Ibid. "Such evidence must be definite, positive and certain in quality and quantity to overcome the presumption." Ibid. Even where the assessment methodology is incorrect, the deficiency does not necessarily "manifest an arbitrary or capricious discharge of the assessor's responsibilities, ... so long as the quantum of the assessment appears to be a reasonable approximation of fair value." Pantasote Co., supra, 100 N.J. at 415, 495 A.2d 1308.
It was well settled by Inmar that an occupied property, with some level of ongoing operations at the time of valuation, will not merit a reduction in assessed property value. On the other hand, an unoccupied property which has ceased operations, thereby triggering the statutorily mandated remediation obligation, will merit a reduction in value for tax assessment purposes.
While the statutes and case law pertaining to tax assessments have yet to identify precisely when a property will be deemed "not in use" for purposes of taxation valuation, the statutes governing industrial contamination and environmental cleanup are unambiguous on this point. The closing of a facility or transfer of ownership triggers N.J.S.A. 13:1K-9 (ISRA) which requires contaminate remediation to immediately commence. The closing of operations is defined in N.J.S.A. 13:1K-8(1) as "the cessation of operations resulting in at least a 90 percent reduction in the total value of the product output ... or, for industrial establishments for which the product output is undefined, a 90 percent reduction in the number of employees...."
Here, the Borough follows the statutory definition of "closed down" under ISRA in its determinations as to when a property devaluation is to be triggered for contamination remediation. If the Pan Chem property is not to be treated as "closed" for statutory cleanup purposes, then it is not unfair that it be treated as a continuing operation, that is, not closed for tax assessment purposes. Otherwise, as expressed in University Plaza, supra, there *1226 could be "a windfall tax benefit to the very persons responsible for toxic conditions, even though no actual clean-up costs are incurred." 264 N.J.Super. at 358, 624 A.2d 1000. Earlier, the language of ECRA did not contain the "ten percent of operations" definition as a bright-line standard to determine whether a property was "closed down." In 1993, the legislature enacted this standard in ISRA. Thus, our Supreme Court did not have the legislative terms of that standard before them for consideration at the time of the Inmar decision which was decided in 1988.
We are persuaded that the Borough had a reasonable basis to rely on the legislative definitions set forth in ISRA and in applying them elsewhere to determine whether a property is shut down for taxation purposes. Hence, we are satisfied that the Borough conducted a "reasonable approximation of fair value" in doing so. Pantasote, supra, at 415, 495 A.2d 1308.
The degree to which a property is "in use" or "closed down" cannot be left to subjective standards resulting in inconsistent determinations. ISRA provides a rational, objective standard by which one can determine whether property is in use for tax purposes, as well as for determining whether the obligation to remediate has been triggered. We perceive nothing in the Supreme Court's opinion in Inmar, which preceded ISRA and its "ten percent standard," as precluding this result.
The treatment applied to the GAF property in Inmar should control, as here, when the property is "in use" as defined by N.J.S.A. 13:1K-8(1) at the time of assessment. By consulting the facility closure standards established under ISRA for assessment purposes, uniformity, understanding and consistency of outcomes in our tax cases will result.
Remanded for further proceedings in accord with the standards articulated in this opinion.