DeALMEIDA, P.J.T.C.
This is the court’s opinion after trial in the above-referenced matters. At issue is the valuation for local property tax purposes of real property that suffers from environmental contamination. For the reasons stated more fully below, the assessments on the property for tax years 2006,2007 and 2008 are reduced.
I. Findings of Fact
The court makes the following findings of fact based on the testimony and documents admitted as evidence.
During the tax years in question, plaintiff Red Roe Realty, LLC was the owner of real property in defendant Lyndhurst Township. The parcel is designated in the records of the municipality as Block 235, Lot 1, and is commonly known as 340 Orient Way.
The subject property is comprised of 8.88 acres with obsolete industrial improvements. Formerly the Delaware Lackawanna and Western Railroad locomotive facility, the site was initially developed in 1906 to manufacture and repair locomotives and rail *368 cars. The main structure is a 100,230-square-foot building with a glass, apex roof typical for a heavy steel manufacturing facility at the turn of the twentieth century. The building, which has an earthen floor, is designed to accommodate a series of cranes several stories high to manufacture and repair steel trains. The structure has ceilings 50 to 60 feet in height, no heat or air conditioning and is functionally obsolete. The site also includes a small amount of supporting office space with a typical finish and the remnants of a brass foundry, an iron foundry, a boiler shop, a blacksmith shop, and tin, pipe, and copper shops. The building is in fair condition.
It is undisputed that the property is polluted with dangerous compounds as the result of industrial activities carried out prior to the time plaintiff took title. The exact cause of the pollution and the extent to which various industrial practices may have contributed to the environmental damage is the subject of contention among plaintiffs predecessors in title. It is not necessary for the court to delve into these disputes, as it will suffice to note that no party has suggested that plaintiff has contributed to the contamination of the property. Plaintiff did, however, agree to assume full responsibility for remediation of the contamination, as part of plaintiffs plan to redevelop the parcel.
Some background with respect to the use of the property will assist to understand plaintiffs claims. In 1951, Benedict Miller, Inc. (“BMI”), the then owner of the property, began using the site predominantly as a metals foundry. That company’s operations included distributing, cutting, shearing, grinding, heat-treating, degreasing, and pickling metals. During the period of BMI’s operations, the New Jersey Department of Environmental Protection (“DEP”) received a report of a spill of hazardous chemicals at the property. The report resulted in BMI’s initiation of an investigation of the property’s environmental status.
In 2003, BMI ceased all operations on the property, triggering a statutory obligation to remediate the environmental contamination under the Industrial Site Recovery Act (“ISRA”), N.J.S.A. 13:1K-6 to -14. Because BMI had already begun an investigation of the *369 property’s contamination and had expressed an interest in conducting a voluntary cleanup of the property, the DEP did not proceed under ISRA to compel remediation.
On April 28, 2004, EcolSciences, an environmental analysis firm, issued a Phase I Environmental Assessment and a Preliminary Assessment of the subject property. The Phase II Site Investigation Soil and Groundwater Sampling Report, which detailed the history of the property and its environmental contamination, was issued on July 23, 2004. At that time, the firm estimated the costs of clean-up to be somewhere between $2,392,681 and $3,007,273.
On November 28, 2005, Orient Way Corporation, an affiliate of BMI, and plaintiff entered into a contract for the sale of the subject property “as is” to plaintiff for $2,500,000. Negotiations for the sale began prior to the October 1, 2005 valuation date for tax year 2006. There is credible evidence in the record that the sale was an arms’ length transaction among sophisticated parties who were aware of the environmental contamination on the property. Plaintiff, a holding company created solely for the purpose of purchasing the subject property and effectuating its redevelopment, was represented by counsel during the negotiation. The parties were aware of the contamination, the statutory obligation to remediate if voluntary action was not taken, and the existing estimate of cleanup costs. During the negotiations, plaintiff was provided with a copy of the preliminary estimate of cleanup costs of between $2,392,681 and $3,007,273 previously prepared for BMI. Plaintiffs principal credibly testified that he was aware that the estimate was not an upward limit on costs and that if the actual remediation cost exceeded this amount plaintiff could not demand reimbursement from BMI. The purchase price was arrived at through the exchange of offers and counteroffers from the parties.
Plaintiffs intention at the time of the purchase was to remediate the property under the Brownfield and Contaminated Site Remediation Act (“Brownfield Act”), N.J.S.A. 58:10B-1, et seq. This statute authorizes the partial reimbursement of remediation costs undertaken with government approval to redevelop contaminated *370 property. As a condition to the purchase of the property plaintiff prepared for the DEP a Memorandum of Agreement (“MOA”) application in order to obtain governmental approval and oversight of the environmental cleanup at the property.
In addition, in light of plaintiff’s intended cleanup and redevelopment of the property, plaintiff assumed BMI’s obligations to remediate the property. In the purchase agreement plaintiff agreed to be “solely liable to comply with and satisfy all of Seller’s and BMI’s obligations, duties and liabilities arising for the Remediation of the Property and all Hazardous Substances at, under or from the Property ... under any and all Environmental Laws.”
On March 1, 2006, prior to the transfer of title, the DEP confirmed the MOA application had been received and was administratively complete. If approved, the MOA would create a contract requiring plaintiff to submit contamination remediation plans to the DEP for approval and to implement the approved remedial action work plan for the property.
In April 2006, also prior to the transfer of title, plaintiff and the State Treasurer entered into an agreement to reimburse remediation costs pursuant to the Brownfield Act. The agreement provided that, in the event the remediation plan was approved, in exchange for implementing and funding the site’s remediation pursuant to the proposed DEP MOA, the State would reimburse plaintiff for a portion of the remediation costs.
The transaction closed and title to the subject property passed to plaintiff on May 1, 2006. DEP approval of the proposed remediation plan was not in place at that time. Because plaintiff could not obtain financing to purchase contaminated property without a government-approved remediation plan, BMI held a two-year, $1.7 million mortgage at 8% annual interest. Plaintiff was obligated to make two annual payments of interest only to BMI, with the full amount of the mortgage due at the end of two years. It was plaintiffs intention to obtain DEP approval of the remediation program and, as a result, secure financing for the purchase of the property, prior to the expiration of the two-year period.
*371 In July 2007, plaintiff hired Lorax Environmental and its principal David Morris to effectuate approval of the remediation plan and execution of the cleanup process. To trigger commencement of the cleanup, Mr. Morris, who testified as a fact witness at trial, intended to submit to DEP a series of remediation proposals for small segments of the property. He was of the opinion that the agency would analyze and approve smaller plans more rapidly than would be the case if a plan for remediation of the entire property was submitted at one time.
On November 8, 2007, Mr. Morris submitted to the DEP a Remedial Action Work Plan for a segment of the building designated as the heat treatment area. In addition, Mr. Morris oversaw soil and other testing at the subject property by environmental firms, including testing that resulted in a March 2008 Waste Characterization Test Result, performed by Accredited Analytical Resources. Plaintiff paid for these tests.
In an effort to engage the DEP and facilitate the approval of the remediation plan, Mr. Morris held a meeting with the DEP Case manager on March 18, 2008, during the final tax year at issue here. Mr. Morris created minutes for that meeting. The previous DEP case manager for the subject property was on an extended leave, and, as a result, the ease manager had a large backlog of cases. From the minutes of that meeting:
the NJDEP never responded to the initial [ISRA] Preliminary Assessment Report (PAR) and the Site Investigation Report (SIR) both submitted by Woodard & Curran in 2004; nor to the first incremental (area-specific) Remedial Action Workplan (RAW) submitted by Lorax in November 2007. Comment and approval from the NJDEP is necessary before any work can progress.
Mr. Morris testified that while DEP approval is not necessary for a voluntary cleanup program to begin, acting without the Department’s approval constitutes acting “at your own peril.” In those circumstances, if the remediation work performed is found to be inadequate, the owner could face additional costs necessary to perform additional remediation to secure the approval of the DEP. Plaintiff did not proceed with any remediation without DEP approval.
*372 Plaintiffs principal was also the principal of an unrelated entity engaged in the construction business. During plaintiffs ownership of the property, the construction entity used the subject property for outdoor storage of contracting materials, stone crushing, the storage and repair of its equipment and trucks, and for interior office use. A small amount of materials stored on the property were sold by the construction entity to third parties. In addition, plaintiff intended to use a portion of the stone crushed on the property as a cap to cover the polluted areas of the property under a remediation plan. Approximately eight employees of the construction company used office space at the subject property. Neither plaintiff nor the construction entity engaged in any of the industrial or manufacturing activities of prior owners which resulted in contamination of the subject property. Nor is there any suggestion in the record that activity at the subject property during plaintiffs ownership contributed to the contamination.[1]
Plaintiff was unable to secure government approval of a remediation plan before the two-year mortgage became due. BMI, which had been paying all local property taxes on the parcel due to plaintiffs distressed financial condition, declined to extend the mortgage and threatened foreclosure. Plaintiffs principal testified that he had two options as the mortgage approached its due date: bring plaintiff into bankruptcy or sell the property. He opted for the latter and retained a broker to market the property.
On September 12, 2008, neai’ly a year after the last valuation date, plaintiff sold the subject property to 340 Orient Way, LLC for the sum of $2,400,000.00. There is credible evidence in the record that the purchase price was reached after negotiations with the purchaser, a sophisticated developer. The purchaser agreed to assume BMI’s obligations to remediate the contamination as part of a plan for the property’s redevelopment. After plaintiff sold the property, it remained on site for four months in order to *373 remove its equipment and locate substitute storage and work space. The lease terms, $15,000 a month, were not included in the negotiations over a sales price of the property.
For tax years 2006, 2007 and 2008 the property was assessed as follows:
Land $6,600,000
Improvements $ 237,900
Total $6,837,900
Tax year 2006 was a revaluation year for Lyndhurst Township. As a result, the property is presumed to be assessed at 100% of value. See Elrabie v. Borough of Franklin Lakes, 24 N.J.Tax 158, 180 (Tax 2008)(citing Brown v. Borough of Glen Rock, 19 N.J.Tax 366, 373 (App.Div.), certif. denied, 168 N.J. 291, 773 A.2d 1155 (2001)). The Chapter 123 average ratio for Lyndhurst for tax year 2007 is 112.30%. The upper limit of the common level range for 2007 is 100%; the lower limit of the common level range is 95.45%. The Chapter 123 average ratio for Lyndhurst for tax year 2008 is 103.11%. The upper limit of the common level range for 2008 is 100%; the lower limit of the common level range is 87.64%.
On March 30, 2006, plaintiff filed a Complaint in this court challenging the tax year 2006 assessment on the property.[2]
On March 29, 2007, plaintiff filed a Complaint in this court challenging the tax year 2007 assessment on the property.
On March 20, 2008, plaintiff filed a Complaint in this court challenging the tax year 2008 assessment on the property.
*374 After discovery, the matters were consolidated for trial.
The parties stipulated to the “unencumbered, clean” value of the subject property as follows:
For tax year 2006 $5,100,000 as of 10/01/2005
For tax year 2007 $5,200,000 as of 10/01/2006
For tax year 2008 $5,400,000 as of 10/01/2007
These stipulated values will result in a reduction in the assessments for each tax year, whether or not plaintiff prevails in its demand for an adjustment to true market value to account for environmental contamination.
Defendant moved prior to trial to bar the Preliminary Assessment Report and Site Investigation Report, the MOA with the DEP, and all other documents and testimony regarding estimates of the cost of remediation of contamination at the subject property. Included in defendant’s motion was a request to bar testimony by plaintiffs appraisal expert with respect to cleanup costs. Defendant’s primary argument in support of the motion is that an adjustment to the stipulated clean value of the property for environmental contamination cannot be made without a cleanup plan approved by a government agency. Defendant contends that because a remediation plan was not approved for the subject property on any of the valuation dates, plaintiffs evidence of estimates of cleanup costs is irrelevant and, if offered by an expert, constitutes a net opinion. At the time of trial, the court reserved decision on defendant’s motion.
As is explained in greater detail below, the court concludes that a government-approved cleanup plan is not a necessary predicate for an adjustment to assessed value for environmental contamination. See Inmar Assocs., Inc. v. Borough of Carlstadt, 112 N.J. 593, 549 A.2d 38 (1988)(remanding matter for contamination adjustment where taxpayer was “unable to ascertain the full extent of the cleanup costs at the assessment date because neither the *375 exact degree of contamination nor the level to which the contamination would have to be cleaned up on the site had been determined by any government agency”). This aspect of defendant’s motion is, therefore, denied.[3]
Defendant also argues that evidence of estimates of the cleanup costs for the subject should be barred as evidence because plaintiff may not benefit from a reduction in the assessed value based on environmental contamination where the property was in use on the valuation dates. See Pan Chemical Corp. v. Borough of Hawthorne, 404 N.J.Super. 401, 961 A.2d 1219 (App.Div.), certif denied, 198 N.J. 473, 968 A.2d 1189 (2009). As is also explained in greater detail below, the court concludes that the holding in Pan Chemical does not preclude a contamination adjustment for the subject property for the years in question. This aspect of defendant’s motion is also denied.
Because defendant’s pretrial motion has been denied, the court admits the documents and testimony introduced at trial concerning the environmental contamination of the subject property. Although defendant contends this evidence is nothing more than net opinion, the court is not convinced of the validity of this position. “The ‘net opinion’ rule appears to be a mere restatement of the established rule that an expert’s bare conclusions, unsupported by factual evidence, is inadmissible.” Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981); see also N.J.R.E. 703. Here, the cleanup cost estimates were not intro duced through expert testimony. They were not offered to prove the accuracy of the estimates. Indeed, plaintiffs principal admitted during trial that plaintiff was aware at the time the property was purchased that the estimates might prove inaccurate. The estimates, instead, were introduced to establish two things. First, that BMI and plaintiff had initiated a voluntary cleanup of the *376 property’s contamination. And, second, that the parties were aware of and relied on the cleanup estimates when negotiating the consideration that would be paid for the property prior to execution of the 2005 sale contract. The estimates are relevant, competent evidence for those purposes. This aspect of defendant’s pretrial motion is, therefore, also denied.
Plaintiff argues that the court should rely on the two sales of the subject as the most reliable evidence of true market value on the valuation dates. According to plaintiff, parties to both transactions were sophisticated and fully aware of the contamination on the property, the obligation to remediate the pollution, and the estimated costs of the cleanup. With these facts in hand, the parties engaged in arms’ length negotiations that resulted in the sale of the property at true market value as contaminated. Plaintiff also contends that if the court were to begin its analysis with the stipulated clean values for the property and make appropriate deductions based on the remediation cost estimates available to the parties to the sales, it is clear that the market participants considered the effect of contamination on the value of the property, making the sales prices the most credible evidence upon which to rely to set the assessments for the relevant tax years.
II. Conclusions of Law
The court’s analysis begins with the well-established principle that “[o]riginal assessments and judgments of county boards of taxation are entitled to a presumption of validity.” MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J.Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court defined the parameters of the presumption as follows:
The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be “definite, positive and certain in quality and quantity to overcome the presumption.”
Ibid, (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413, 495 A.2d 1308 (1985) (citations omitted)).
*377 The presumption of correctness arises from the view “that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law.” Pantasote, supra, 100 N.J. at 413, 495 A.2d 1308 (citing Powder Mill, I Assocs. v. Township of Hamilton, 3 N.J.Tax 439 (Tax 1981)); see also Byram Twp. v. Western World, Inc., 111 N.J. 222, 544 A.2d 37 (1988). The presumption remains “in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity.” Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517, 545 A.2d 746 (1988) (citation omitted).
“In the absence of a R. 4:37-2(b) motion ... the presumption of validity remains in the ease through the close of all proofs.” MSGW Real Estate Fund, LLC, supra, 18 N.J.Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence “as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion.” Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535, 666 A.2d 146 (1995)). In order to overcome the presumption, the evidence must be “sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.” Lenal Props., Inc. v. City of Jersey City, 18 N.J.Tax 405, 408 (Tax 1999), aff'd, 18 N.J.Tax 658 (App.Div.), certif. denied, 165 N.J. 488, 758 A.2d 647 (2000).
Only after the presumption is overcome with sufficient evidence at the close of trial must the court “appraise the testimony, make a determination of true value and fix the assessment.” Rodwood Gardens, Inc. v. City of Summit, 188 N.J.Super. 34, 38- *378 39, 455 A.2d 1136 (App.Div.1982) (citations omitted). If the court determines that sufficient evidence to overcome the presumption has not been produced, the assessment shall be affirmed and the court need not proceed to making an independent determination of value. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312, 604 A.2d 580 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J.Tax 698, 703-704 (App.Div.1996).
The court concludes that plaintiff proffered sufficient evidence to overcome the presumption of validity attached to the assessments. on the subject property. The parties stipulated to the value of the property clean as of the valuation date for each tax year. The stipulated clean value, even without any reduction for environmental contamination, is more than $1 million below the assessed value for each tax year and would warrant a reduction in the assessment for each tax year. This alone is sufficient to overcome the presumption of validity.
In addition, plaintiffs evidence of two negotiated sales of the subject property, one in close proximity to the first valuation date, for several million dollars below the assessments also supports the conclusion that the presumption of validity has been overcome. Those sales, if considered in the light most favorable to plaintiff, as is required at this juncture of the analysis, demonstrate that participants in the marketplace who were aware of the contamination and an estimate of the cost of remediation negotiated true market values well below the assessments.
The determination that the presumption of validity has been overcome does not end the court’s inquiry. In light of the evidence produced by plaintiff, it is the court’s obligation to determine the true market value of the subject property on the three valuations dates at issue here: October 1, 2005, October 1, 2006 and October 1, 2007. As noted above, the parties have stipulated to the value of the subject property as of those dates cleaned of environmental contamination. The property was not clean on those dates, however, creating the question of whether, and to what extent, the contamination affects the assessable value of the property.
*379 Defendant argues that no deduction should be made for the contamination because plaintiff was using the property for business purposes on the relevant valuation dates. According to defendant, the Appellate Division’s holding in Pan Chemical, supra, unequivocally states that a taxpayer who is using property cannot benefit from a reduction in the assessment due to environmental contamination. Moreover, defendant contends, even if plaintiffs use of the property does not preclude a reduction in the assessment, the record contains insufficient evidence on which a reduction in the assessment can be calculated. Defendant argues that without evidence of a remediation plan approved by a government agency and expert testimony establishing the cost of complying with that plan, a reduction in the assessment cannot be determined by this court.
Plaintiff argues that its use of the property was for purposes unrelated to the industrial activities that resulted in the contamination. Thus, according to plaintiff, the holding in Pan Chemical, supra, does not apply. In addition, plaintiff contends that the published opinions concerning an adjustment to assessed value for environmental contamination are not applicable here. According to plaintiff, the record contains reliable evidence of the true market value of the subject property as contaminated because the property was sold twice in close proximity to the valuation dates in arms’ length negotiations between sophisticated parties fully aware of the environmental contamination on the property and having an estimate of remediation costs. Thus, plaintiff contends, the court need not apply a reduction for contamination but should use the comparable sales approach to determine value, relying on the sales of the subject. Additionally, plaintiff argues that if the court elects to make a deduction for contamination, plaintiff has produced sufficient evidence though which such a deduction can be calculated.
A review of the controlling precedents will provide the necessary backdrop for the court’s legal analysis. Our Supreme Court has unequivocally held that environmental contamination has an impact on property valuation for local property tax purposes. Inmar, supra. In that case, the Court considered appeals of local *380 property tax assessments by two owners of contaminated industrial properties. In one ease, the property was in use as an asphalt siding plant on the relevant valuation dates. The owner contemplated that it might remove the plant from service and sell the property and was aware that a recently enacted statute would require the property to be cleaned prior to sale. 112 N.J. at 596, 549 A.2d 38. A principal of the taxpayer “estimated” the cost of the cleanup “based on an inspection of the property but without a sampling study.” Id. at 597, 549 A.2d 38. In addition, the taxpayer presented “no evidence of a cleanup plan approved by the [DEP].” Ibid. The parties stipulated to a value for the property clean. The taxpayer argued that the property tax assessment should be calculated by deducting from the stipulated value clean the taxpayer’s estimated cleanup cost. Ibid.
In the second case before the Court in Inmar, the taxpayer owned a parcel on which its long-term tenant maintained an industrial solvent recovery operation. The tenant abandoned the property, leaving sixty-seven tanks containing various chemical wastes and solvents leaking into the soil. Id. at 598, 549 A.2d 38. The DEP filed suit against the property owner and tenant to compel cleanup of the site, which had also been placed on the federal Superfund list. See 42 U.S.C. §§ 9601 to 9675 (Comprehensive Environmental Response, Compensation, and Liability Act of 1980). The taxpayer estimated the cost to clean up the property, but
was unable to ascertain the full extent of the cleanup costs at the assessment date because neither the exact degree of contamination nor the level to which the contamination would have to be cleaned up on the site had been determined by any government agency.
[Id. at 598-599, 549 A.2d 38.]
The taxpayer argued that the property was unmarketable and therefore should be regarded as having no value, or, in the alternative, that the cleanup costs incurred by the taxpayer should be deducted dollar for dollar from the value of the property as if clean. Id. at 599, 549 A.2d 38.
Recognizing that all property in the State must be assessed at true value, see N.J.S.A. 54:4-23 (the tax assessor must “determine the full and fair value of each parcel of real property situate in the *381 taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1____”), the Court held that where environmental contamination drives “down the value of commercial property potentially subject to cleanup costs, the effect of those market forces cannot be ignored in the assessment process simply because it would be counter to the environmental policy.” Id. at 606, 549 A.2d 38 (footnote omitted).
The exact role that contamination plays in the assessment valuation process, however, was not established by the Court in Inmar. “Where exactly environmental cleanup cases fit in such a spectrum was not fully developed” by case law, the Court noted. Id. at 605, 549 A.2d 38. Justice O’Hern, writing for a unanimous Court, however, eliminated one approach:
One thing is certain: the methodology for resolving the question is not simply to deduct the cost of the cleanup from a putative value of the property. That would reflect only the cost accounting of the current owners.
An owner’s expenditures of cost are “never conclusive on the question of value for tax purposes;” Dworman v. Borough of Tinton Falls, 1 N.J.Tax 445, 455 (Tax Ct.1980), aff'd, 180 N.J.Super. 366, 3 N.J.Tax 1[434 A.2d 1134](App.Div.) certif. denied, 88 N.J. 495[443 A.2d 709] (1981)(quoting Borough of Haworth v. State Board of Tax Appeals, 132 N.J.L. 306, 308[40 A.2d 353] (1945)); and “[m]ere costliness, therefore, cannot rationally be made the basis of exemption from taxation.” CPC Int’l v. Borough of Engelwood[Englewoods ] Cliffs, 193 N.J.Super. 261, 268[473 A.2d 548] (App.Div.1984)(quoting Turnley v. City of Elizabeth, 76 N.J.L. 42, 44[68 A. 1094] (Sup.Cit.1908)).
[Id. at 605, 549 A.2d 38.]
Notably, the Court’s analysis included several references to the fact that statutes mandating the remediation of environmental contamination were relatively new on the valuation dates at issue in Inmar and that market evidence of the effects of those laws was not yet available. As the Court noted, “the question that remains to be tested is whether a strong environmental cleanup policy will drive real estate values up or down.” Id. at 606, 549 A.2d 38. The Court suggested that in the absence of evidence of market data contaminated properties might best be treated as special purpose properties “using a measure of flexibility that will aid in the determination of’ true value. Ibid. “Generally, when ‘there is no market’ for the property, a property may be so *382 classified.” Ibid, (quoting Sunshine Biscuits, Inc. v. Borough of Sayreville, 4 N.J.Tax 486, 495 (Tax 1982)).
Moreover, the Court recognized that contaminated property for which there is no market may have “a distinct ‘value in use’ to the owner so long as the owner continued to operate the facility. Hence, when property is in use, normal assessment techniques will remain an appropriate tool in the appraisal process.” Id. at 607, 549 A.2d 38. In addition, the Court noted that “the seeds of useful doctrine” were present in the suggestion that “the cost to cure the contaminated property could be treated as a capital improvement, which can be depreciated over the beneficial life of the property.” Ibid.
With respect to the asphalt plant, the Court affirmed a lower court decision upholding the assessment without a reduction for environmental contamination because the property was in use on the valuation dates. The appeal concerning the property on which the industrial activity resulting in the contamination had been abandoned was remanded for a reduction in the assessment to account for environmental contamination. Id. at 609-610, 549 A.2d 38.
In Badische Corp. (BASF) v. Town of Kearny, 288 N.J.Super. 171, 672 A.2d 186 (App.Div.1996), the court reviewed a challenge to an assessment on contaminated industrial property. The taxpayer had ceased to use the property prior to the valuation date, triggering a statutory cleanup obligation. The taxpayer also submitted a site evaluation and sampling plan to the DEP, began sampling and received test results prior to the valuation date. Id. at 179, 672 A.2d 186. As a result of the testing, an officer of the taxpayer estimated the amount of contamination and the cost of remediation. Id. at 179-180, 672 A.2d 186. A $10 million reserve was created to cover the estimated costs of cleanup. Id. at 180, 672 A.2d 186. The taxpayer conceded that the $10 million estimate was subject to change based on the cleanup level negotiated with the DEP. As of the trial date in this court, the taxpayer had not submitted a cleanup plan to the DEP, nor had the DEP placed any restrictions on the use of the buildings on the property. Ibid. *383 The Tax Court found that the taxpayer had not met its burden of proof with respect to establishing cleanup costs and therefore did not adjust the assessed value of the property for environmental contamination. Id. at 181, 672 A.2d 186.
The Appellate Division reversed. The court held that the taxpayer had produced sufficient evidence to establish that an adjustment to the assessed value was warranted for environmental contamination. The court explained,
[a]s of the assessment date, BASF had submitted a detailed [report] to the DEP documenting the environmental history of the subject property. A sampling plan setting forth the method of testing to determine the extent of contamination was submitted and approved by the DEP. Soil and groundwater testing were substantially complete, and some results were available enabling BASF to estimate the amount of contamination and the cost of cleanup at $10 million. BASF established a $10 million reserve to cover these costs. These proofs at least equal, if not surpass, those submitted by Inmar and found by the New Jersey Supreme Court sufficient to warrant remand. We therefore remand to the Tax Court to adjust the value of the subject property due to environmental contamination.
[Id. at 183, 672 A.2d 186.]
The court did not provide guidance with respect to how the evidence produced by the taxpayer should be used to calculate an adjustment to account for contamination, leaving that question to this court’s “specialized knowledge and expertise.” Id. at 184, 672 A.2d 186.
In Metuchen I, LLC v. Borough of Metuchen, 21 N.J.Tax 283 (Tax 2004), the court examined facts similar to those presently before the court. The assessment at issue in that matter concerned a parcel which was contaminated with pollutants as a result of the operation of a manufacturing facility. The industrial operations had been shut down and the property sold. Id. at 286. The new owner, who had assumed responsibility for all cleanup costs, appealed the assessment on the property, seeking a reduction to the assessed value based on cleanup costs, for which it had secured an estimate. Ibid. The parties stipulated to the value of the property clean and the “only issue for determination [was] how that value should be reduced to take into account the contamination.” Ibid.
The court determined that “the appropriate way to deal with the contaminated property in this ease is to discount over five years *384 the remaining cleanup costs rather than allowing all of it to be deducted in every year once the cleanup has begun.” Id. at 295. The court explained that “[t]o allow continued deductions after the money has been expended ignores the reality that after money is expended the property is worth more.” Ibid. The court found that a five-year discount period was appropriate because the evidence in the record, including letters of credit, insurance and cost estimates, established that the owner contemplated completion of the remediation process over five years.
The Appellate Division opinion in Pan Chemical, supra, concerns the Court’s holding in Inmar that an adjustment for environmental contamination is not warranted where the subject property remains in use, a subject in dispute in this matter. In Pan Chemical, the taxpayer occupied the subject property for fifty-five years for the purpose of manufacturing industrial coatings, color dispersions, inks and nail polish. These activities resulted in environmental contamination of the property. 404 N.J.Super. at 405, 961 A.2d 1219. In 1999, the owner moved its manufacturing operations and thirty-plus employees to another town. It left only three employees on the polluted property and two of its seven buildings in use. Ibid.
The owner’s President testified that the reason the manufacturer did not shut down operations completely was to avoid or postpone its legal obligation to clean up the property, which would have been triggered under state environmental laws by a cessation of business on the site. Ibid, (citing N.J.S.A. 13:1K-6 to -14). In fact, the record demonstrated that the property owner, aware that a statutory cleanup obligation would obtain if 90% of operations ceased, intentionally kept 15% of its operations on the property to avoid the statutory trigger. Id. at 411, 961 A.2d 1219. The property owner “conceded it made no efforts to improve or maintain the property, other than removal of the leaking storage tanks.” Id. at 405, 961 A.2d 1219.
The taxpayer appealed the local property tax assessments on the property. Mindful of the Supreme Court’s holding in Inmar that an adjustment of environmental contamination is not appro *385 priate where a property is in use, the Tax Court determined that the Pan Chemical parcel should be treated as closed, in light of the fact that the majority of the property owner’s operations and employees had been moved to another parcel. Id. at 411, 961 A.2d 1219. Considering the property to no longer be in use, the Tax Court reduced the assessments to account for environmental contamination.
The Appellate Division reversed. The court held that the taxpayer
would have it both ways. It wanted the property to be deemed “in use” during the years on appeal for the sole purpose of avoiding the costly cleanup mandated by ISRA. Now, [the taxpayer! wants the property to be deemed “not in use” over the same period of time in order to claim a reduced tax liability.
[Id. at 411, 961 A.2d 1219.]
The court’s holding is unequivocal: “If the ... property is not to be treated as ‘closed’ for statutory cleanup purposes, then it is not unfair that it be treated as a continuing operation, that is, not closed for tax assessment purposes.” Id. at 413, 961 A.2d 1219. The court continued, “[ojthwerwise ... there could be ‘a windfall tax benefit to the very persons responsible for toxic conditions, even though no actual clean-up costs are incurred.’ ” Ibid, (quoting University Plaza Realty Corp. v. City of Hackensack, 264 N.J.Super. 353, 357-358, 624 A.2d 1000 (App.Div.)(allowing adjustment to assessed value of real property for voluntary remediation of asbestos while property is in use), certif. denied, 134 N.J. 481, 634 A.2d 527(1993)).
The Appellate Division directed that this court use as a guide in its analysis of the “in use” status of property the State’s environmental statutes. As the court explained,
[w]hile the statutes and case law pertaining to tax assessments have yet to identify precisely when a property will be deemed “not in use” for purposes of taxation valuation, the statutes governing industrial contamination and environmental cleanup are unambiguous on this point. The closing of a facility or transfer of ownership triggers N.J.S.A. 13:1K-9 (ISRA) which requires contaminate remediation to immediately commence.
[Id. at 413, 961 A.2d 1219.]
These statutes provide a reasonable framework for determining whether adjustments to assessed value should be made for environmental contamination:
*386 The degree to which a property is “in use” or “closed down” cannot be left to subjective standards resulting in inconsistent determinations. ISRA provides a rational, objective standard by which one can determine whether property is in use for tax purposes, as well as for determining whether the obligation to remediate has been triggered.
[Id. at 414, 961 A.2d 1219.]
Under the holding in Pan Chemical, plaintiff is not precluded from securing the benefit of an adjustment to the assessed value of its property based on environmental contamination. In 2006, BMI sold the subject property to plaintiff. This sale triggered a cleanup obligation under state law. See N.J.S.A. 13:1K-6 to -14. Recognizing this obligation, BMI and plaintiff took affirmative steps to institute a voluntary remediation of the subject property. BMI commissioned a study by environmental experts of contaminates for the purpose of formulating a cleanup plan. The study included an estimate of cleanup costs. Plaintiff, seeking to remediate the pollution and redevelop the property, also engaged environmental experts to advance a remediation program and to coordinate efforts with the DEP to clean the property. Plaintiff executed an MOA with the DEP and made concerted efforts to obtain approval of a remediation program in order to secure the financing necessary to clean the property. Plaintiff’s efforts in this regard were frustrated by the agency’s slow response to repeated inquiries. In addition, plaintiff demolished loading docks in order to uncover ground for environmental testing and stored crushed stone on the property intended for use as a cap on polluted areas of the parcel. There was no effort by plaintiff to avoid remediation of the property. In fact, plaintiff’s intention in purchasing the property was to remediate the contamination, as evidenced by plaintiff’s voluntary assumption at the time of purchase of all of BMI’s obligations to clean the property.
The modest use of the property by the construction company in which plaintiff’s principal had a controlling interest does not change this conclusion. The use of the property while plaintiff awaited approval of its remediation plan was by an entity entirely unrelated to the prior owners of the property responsible for its contamination. In addition, the use of the property was for purposes which themselves did not result in contamination and *387 which were unrelated to the prior manufacturing processes. Furthermore, at least some of the use of the property was related to the intended cleanup, as plaintiff stored crushed rock for later use in the remediation program.
Here, the polluter of the property is not seeking a windfall through a reduction in the property’s assessed value while also benefiting from its continued use of the property for the very purposes that caused the contamination. Nor can it be said the plaintiff “wants it both ways” by both keeping the property “in use” to avoid an obligation to remediate and claiming the property is “not in use” for purposes of securing a reduction in the assessment on the parcel. Plaintiff voluntarily assumed the responsibility to clean the property and actively sought DEP approval of a remediation plan. It in no way sought to avoid a cleanup.
Nor does the court read the holdings in Inmar and Pan Chemical to require a total abandonment of a parcel before environmental contamination can be considered for local property tax assessment purposes. If, as is the ease here, the property owner is not responsible for the pollution, is not related to the party or parties who polluted the property, has voluntarily assumed responsibility for cleaning up the property and is actively pursuing approval of a remediation plan, the property owner should not be burdened by a requirement that it abandon the property in order to benefit from a reduction in the tax assessment to reflect the existence of contamination. A contrary holding would be a disincentive to remediation of the property, as potential redevelopers would be precluded from any use or benefit from the property as the oft-times lengthy remediation approval process takes place.
Of course, the non-polluting owner’s use of the property during the remediation approval process will play a role in the calculation of the assessment. If the use of the property, even if unrelated to the prior polluting activity, is extensive, income generating and apparently unhindered by the pending remediation it may well be the case that the property’s income generating potential will meet *388 or exceed any reduction appropriately attributable to the contamination. If, on the other hand, the use of the property is incidental, generates no substantial income, and takes place during good faith attempts by the owner to advance the cleanup of the property, the use of the property will have no impact on the assessed value of the parcel. This is true because, absent evidence of a market for income-generating activity on the property during the remediation approval process, the court could not attribute any market value to that use.
Such is the case here. The record demonstrates that the use of the subject property by the construction company of plaintiffs principal was incidental. There is no evidence in the record that the property was marketed by plaintiff for lease, that the construction company’s activities on the property generated significant income or that a market exists for the use of a contaminated parcel that is poised for remediation and redevelopment. Based on this record the court concludes that plaintiffs incidental use of the property does not warrant an adjustment to the property’s assessed value.
Nor is there any support for defendant’s contention that an adjustment for contamination may be made only if the property owner has obtained a government-approved remediation plan. The Supreme Court’s holding in Inmar is directly on point. In that ease, with respect to one of the contaminated properties under review, the taxpayer estimated the cost to clean up the property, but
was unable to ascertain the full extent of the cleanup costs at the assessment date because neither the exact degree of contamination nor the level to which the contamination would have to be cleaned up on the site had been determined by any government agency.
[112 N.J. at 598-599, 549 A.2d 38.]
The Court rejected the contention that an adjustment for that property was not warranted, remanding the matter to the Tax Court for a determination of how the taxpayer’s estimated cleanup costs should affect the assessed value of the property.
Similarly, in Badische Corp., supra, the property owner had investigated the contamination of its property and estimated the *389 cost of cleanup, but had not submitted a cleanup plan to the DEP. Nor had the agency placed restrictions on the use of the property. 288 N.J.Super. at 180, 672 A.2d 186. The Appellate Division remanded the matter to this court to make an adjustment to the assessment to account for the contamination, despite the absence of a government-approved remediation plan.
Having decided that no bar exists to the consideration of the contamination on the subject property, the court turns to the question of determining the true market value of the parcel on the relevant valuation dates, with consideration for its contaminated state. The court’s task is assisted considerably by what appears to be an unusual circumstance in the published opinions concerning the valuation of contaminated property. The record contains credible evidence of a market-derived sales price of the contaminated subject property reached through arms’ length negotiations in which the parties were in possession of an expert’s estimate of remediation costs.
A. Tax Yea,r 2006
The November 2005 contract, less than a month after the valuation date for the first tax year, was the result of negotiations between a willing seller, not compelled to sell, and a willing buyer, not compelled to buy. BMI, a sophisticated party represented by counsel, was aware of its obligation to remediate the property and of its redevelopment potential once clean. Plaintiff, whose principal was also a principal in a construction company, was represented by counsel and was aware of the contamination on the property, the need to remediate and the parcel’s redevelopment potential once clean. In fact, it was plaintiffs intention to remediate the property under the State’s Brownfield program for redevelopment. BMI was motivated to have plaintiff assume responsibility for the cleanup of the property. Plaintiff was motivated by its entrepreneurial drive to clean the property with the assistance of State funds in the hope of generating profits from the redevelopment of the property once it was cleaned. Their competing interests resulted in a negotiated sales price of $2.5 million.
*390 True market value is “ ‘the most probable price, as of a specified date ... for which property ... should sell after reasonable exposure in a competitive market’ under conditions insuring a fair sale from a knowledgeable seller to a knowledgeable buyer.” Brockway Glass Co. v. Township of Freehold, 10 N.J.Tax 356, 371 (Tax 1989)(citing American Institute of Real Estate Appraisers, The Appraisal of Real Estate 19 (9th ed.1987)), aff'd, 12 N.J.Tax 263 (App.Div.1991), remanded on other grounds, 130 N.J. 3, 611 A.2d 643 (1992). In other words, this court must determine the sales price that would result from “a fair, bona fide, and uncoerced private sale” of the property. Ibid, (citing Pantasote, supra, 100 N.J. at 412, 495 A.2d 1308).
“It is well established that the price established by an arms-length sale of a property is probative of its fair market value.” Passarella v. Township of Wall, 22 N.J.Tax 600, 603 (App.Div.2004). “Indeed, the sales price of a property may be the best indicator of its true value in some circumstances.” Id. at 603 (citing Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 282, 491 A.2d 1247(1985); Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 162, 65 A.2d 828 (1949); Romulus Dev. Corp. v. Town of West New York, 7 N.J.Tax 305, 316-18 (Tax 1985), aff'd o.b., 9 N.J.Tax 90 (App.Div.1987)). A post valuation date sale of the subject property is probative and may be afforded great weight if it is within a few months of the assessment date. Glen Wall Assocs., supra, 99 N.J. at 283, 491 A.2d 1247.
The court finds that the sale of the subject memorialized in the November 2005 contract is the best evidence in the record of the true market value of the property, including the effect on market value of the environmental contamination, as of the October 1, 2005 valuation date for tax year 2006. The trial record distinguishes this case from Inmar, Badische and Metuchen I, where the courts were faced with the task of finding market value of contaminated property in the absence of evidence of market sales. There is no need to resort to the discounting of estimated remediation costs or similar measures to determine the effect on *391 value of the subject property’s contamination in this ease. Here, the market has performed that task.
While it is generally true that this court is reluctant to accept a single sale as evidence of market value, that reluctance is overcome in this case for several reasons. First, the single sale is of the subject in close proximity to the first valuation date. Second, the court cannot reasonably expect to uncover additional sales of contaminated properties sufficiently similar to the subject to serve as credible evidence of value. It may be that other industrial properties in Lyndhurst Township or neighboring communities suffer from a legacy of environmental damage. It is likely, however, the contamination on each will be unique in type and dimension and that the scope and nature of necessary remedial measures will vary greatly depending on the identity and scope of the polluting agents. Adjustments to sales prices in these circumstances would be problematic. The Supreme Court recognized as much in Inmar, where it suggested that contaminated properties might best be considered special purpose properties, given their unique nature and that “a measure of flexibility” might be necessary to determine the appropriate assessments for this type of property. 112 N.J. at 606, 549 A.2d 38. Third, this court must remain mindful of the Supreme Court’s directive in Glen Wall Assocs., supra, 99 N.J. at 280, 491 A.2d 1247, to “be cognizant of expense incurred by litigants” in prosecuting tax appeals and aware that sometimes the factual circumstances of a case, while unusual, require an appropriate and pragmatic application of the existing and relevant statutory scheme. See also Jaydor Corp. v. Township of Millburn, 18 N.J.Tax 655, 657-658 (App.Div.2000).
With these considerations in mind, the court concludes that the true market value of the subject property on October 1, 2005 was $2,500,000.
Because Lyndhurst Township implemented a municipal-wide revaluation for tax year 2006, N.J.S.A. 54:51A-6, commonly known as Chapter 123, does not apply. See N.J.S.A. 54:51A-6d. The property will be assessed at full market value. The court will *392 enter Judgment setting the tax year 2006 assessment on the property as follows:
Land $2,262,100
Improvements $ 237..900
Total $2,500,000
B. Tax Year 2007
Although the parties did not offer evidence of an appropriate time adjustment to determine true market value for the following two tax years, there is sufficient credible evidence in the record from which the court can make this determination. The parties stipulated to values for the subject property clean. Those values reflected an approximately 2.5% increase from tax year 2006 to 2007 and an approximately 5% increase from tax year 2007 to 2008. The court accepts this stipulation as a credible measure of the appreciation of industrial properties in Lyndhurst Township during the tax years in question. The court will apply that measure of appreciation to the subject property. The court recognizes that this evidence is not perfect, but finds that it is sufficiently credible to determine the true market value of the subject for the periods in question.[4]
With respect to tax year 2007, the court concludes that the time market value of the subject property on October 1, 2006 was $2,562,500 ($2,500,000 x 1.025 = $2,562,500).
Pursuant to N.J.S.A. 54:51A-6a, in a non-revaluation year an assessment must be reduced when the ratio of the assessed value of the property to its time value exceeds the upper limit of the common level range. The common level range is defined by N.J.S.A. 54:1-35a(b) as “that range which is plus or minus 15% of the average ratio” for the municipality in which the subject property is located.
*393 The true market value for tax year 2007 must, therefore, be compared to the common level ratio for Lyndhurst Township for that tax years. The formula for determining the subject property’s ratio is:
Assessment True Value = Ratio
For tax year 2007, the analysis is represented as follows:
$6,837,900 -r- $2,562,500 = 2.67
The Chapter 123 average ratio for Lyndhurst Township for tax year 2007 is 112.30%. Where both the average ratio for the municipality and the ratio for the property’s assessment to its true value exceed the county percentage level (100%), the property shall be assessed at 100% of value. N.J.S.A. 54:51A-6c. Consequently, the court will enter Judgment setting the tax year 2007 assessment for the subject property as follows:
Land $2,324,600
Improvements $ 237.900
Total $2,562,500
C. Tax Year 2008
With respect to tax year 2008, the court concludes that the true market value of the subject property on October 1, 2007 was $2,690,600 ($2,562,500 x 1.05 = $2,690,600).
The tax year 2008 analysis for the subject property is represented as follows:
$6,837,900 ^ $2,690,600 = 2.54
The Chapter 123 average ratio for Lyndhurst Township for tax year 2008 is 103.11%. Where both the average ratio for the municipality and the ratio for the property’s assessment to its true value exceed the county percentage level (100%), the property shall be assessed at 100% of value. N.J.S.A. 54:51A-6c. Consequently, the court will enter Judgment setting the tax year 2008 assessment for the subject property as follows:
*394 Land $2,452,700
Improvements $ 237,900
Total $2,690,600

 The trial record contains testimony suggesting that plaintiff also rented a portion of the subject property to an entity that crushes concrete. The court was presented with no evidence explaining the terms or duration of this rental agreement.

 The tax year 2006 Complaint also names Orient Way Corp. as a plaintiff, presumably because plaintiff did not take title to the property until May 1, 2006, two months after the Complaint was filed. Defendant did not challenge plaintiff's standing to file an appeal, given the fact that it did not hold title to the property on the day that the Complaint was filed. See N.J.S.A. 54:3-21 (authorizing a "taxpayer” feeling aggrieved by an assessment to establish jurisdiction in the Tax Court through the filing of a Complaint). Because Orient Way Corp., the owner of the subject property as of the filing date, was also named as a plaintiff, Red Roc Realty, LLC's standing as a taxpayer as of the filing date is a moot point. As used in this opinion, "plaintiff” refers to Red Roc Realty, LLC.

 Defendant's moving papers also state that plaintiff's “environmental claim must be barred because plaintiff has unclean hands, laches, and/or estopped (sic) by failing to implement a valid cleanup plan as of October 1st of any of the tax years in question." Defendant's brief does not elaborate on these arguments and the court finds no basis for relief with respect to these arguments.

 The court gives no weight to the September 2008 sale of the subject property. That sale took place nearly a year after the last valuation date at issue in this matter. The court leaves for another day the question of whether that sale constitutes credible evidence of market value of the subject property as contaminated for tax year 2009.