SMALL, P.J.T.C.
Plaintiff filed a direct appeal of the property tax assessment on two parcels of land for the 2000 tax year: an unimproved parcel, Block 69, Lot 125.7, and a parcel presently improved with a 197,000 sq. ft. industrial building, Block 71, Lot 37. The parcels are located at Middlesex and Factory Avenues in the Borough of Metuchen. The original appeal included two other parcels but the appeals on those parcels have been withdrawn. The original assessments on the two appealed parcels were as follows:
2000 Assessments
Block 71 Land $ 66,400
Lot 37 Imp. $2,093,500
Total $3,059,900
Block 69 Land $ 30,000
Lot 125.7 Imp. $ -0-
Total $ 30,000
*286 For the 2000 tax year, the Chapter 123 ratio for Metuchen was 91.95% with an upper limit of 100% and a lower limit of 78.16%. N.J.S.A. 54:51A-6.
I.
FACTS
The subject properties are currently owned by plaintiff, Metu-chen I, LLC, which purchased the properties from Oakite Realty on June 29, 1999 for $100. Plaintiff assumed all environmental cleanup costs. Oakite Realty used the facility as a manufacturing plant from 1960 to 1990, during which time the properties became contaminated with industrial pollutants. The parties are agreed that the fair market value of the properties as of October 1, 1999 (the valuation date for the 2000 assessment), clear of contamination, was $1,800,000. The only issue for determination is how that value should be reduced to take into account the contamination.
Plaintiff established that the cleanup costs net of demolition totaled $1,460,177, and submitted an appraisal report by Brian Chester, MAI valuing the properties at $1,800,000 unimpaired. Plaintiff submitted an appraisal report by Michael Hedden, MAI, who valued the properties as contaminated as of October 1, 1999. Mr. Hedden’s valuation began with the unimpaired $1,800,000 market value. He then deducted a 10% stigma factor, the $100 purchase price, $393,069 in acquisition costs, $1,460,177 in cleanup costs, and a 25% entrepreneurial incentive. These calculations resulted in a residual value of ($638,346)[1]. After these deductions, Mr. Hedden derived the value of the two parcels as of October 1, 1999 by adding together the $100 purchase price, $393,069 in acquisition costs, and the residual value of ($638,346) for an indicated value of ($245,177).
Mr. Hedden offered an alternative valuation method. He took the unimpaired market value of $1,800,000 and adjusted it by the *287 estimated rate of appreciation at 9% per annum and entrepreneurial profit of 25%. This approach considered the cost of remediation of $1,460,177 over a two-year period, arrived at an estimated future unimpaired value of $1,909,620, deducted an allowance of 10% for stigma and concluded that the estimated fair market value “as is” was $1,718,658. This amount was then reduced to the present contaminated value of $1,099,941. Plaintiff then deducted the current cleanup costs of $1,284,299 from the clean present value and found a residual value of ($184,358).
Defendant has conceded that the unimpaired true market value of the properties is $1,800,000 and that the remediation costs for the cleanup of the properties is $1,460,177. Defendant, however, contends that cleanup on the property will take significantly more time than two years, pointing out that at the time of trial more than two years had passed since the assessing date of October 1, 1999 and cleanup had barely begun. Defendant also contends that the 25% entrepreneurial incentive and the 10% stigma adjustment presented by plaintiffs expert are too high and are unsupported by evidence in the record. Defendant does not offer alternative percentages.
II.
STIGMA
I begin by concluding that the value of the subject properties should not be diminished by any stigma value.
While it is theoretically possible to construct a definition of environmental stigma, quantifying the effects of environmental stigma is indeed a daunting task. In re Custom Distribution Services, 216 B.R. 136, 154 (Bankr.D.N.J.1997), aff'd in part, rev’d in part on other grounds, 224 F.3d 235 (3d Cir.2000). Those variables influenced by stigma include rental income, occupancy, operating expenses, and capitalization rate. Ibid. The Supreme Court of New Jersey has recognized the potential for the impact of stigma on the valuation of environmentally contaminated property. Inmar Assoc., Inc. v. Borough of Carlstadt, 112 N.J. 593, 609, 549 A.2d 38 (1988). In Inmar, the Court stated that although *288 it was not reasonable to conclude that contaminated property is not marketable, stigma of contamination and other factors suggest that the capitalization rate may have to be altered to reflect the contaminated condition. Ibid. The Court did not foreclose the use of alternative methods of adjustment for the purposes of stigma, but instead left the means employed to the sound discretion of the Tax Court:
We are frank to recognize the difficulty of evaluating such market data [including data relating to stigma], but we have recently reaffirmed the unique capability and responsibility of the Tax Court to exercise its power, in circumstances where the presumption of validity of the local assessment does not apply, to use the information available to make an independent determination of value. Ibid.
In re Custom Distribution Services, (“CDS ”) offers an in-depth discussion of stigma. In CDS, a Chapter 11 debtor brought a proceeding to determine, modify, and reduce real property taxes assessed against its property on the ground that the tax assessor, in determining the property’s value, had failed to properly account for the effects of environmental contamination. The debtor, Custom Distribution Services (“CDS”), contended that at the end of the ten-year projected remediation period, it was entitled to take a 20% deduction from the value of the property to account for effects of environmental stigma continuing after remediation had taken place. 216 B.R. at 155. CDS conducted a market analysis by submitting comparable properties that it argued showed an average 55% reduction in value for environmentally contaminated sites. Ibid. The municipality argued that there should be no stigma reduction because CDS had not provided adequate proof to support its claims that the property would suffer a diminution in value from environmental stigma. Ibid. The municipality did not offer any independent analysis of what the stigma reduction should be, other than to state that the concept was too ephemeral to quantify. Ibid.
The court found that the property was contaminated with such metals as lead, arsenic, and mercury and volatile hazardous organic compounds throughout the soil and down into the groundwater, and noted that the property was identified by the Environmental Protection Agency as a “Superfund Site”. Ibid. Based on this information, the court held that it could not agree with the municipality that no future buyer would be hesitant to acquire this *289 property and that no stigma attached, since a Superfund Site “has been described in the scholarly literature as a classic example of a property to which stigma attaches.” Ibid. The comparable properties used by CDS did not rise to the level of Superfund Site classification, and therefore the court held that the 20% reduction in value for stigma suggested by CDS was not only reasonable, but somewhat conservative based upon the literature that the court had reviewed. Ibid.
Other courts have addressed the issue of stigma, but have not discussed the issue in depth. In Westling v. County of Mille Lacs, 1995 WL 128511 (Minn.Tax 1995), aff'd, 543 N.W.2d 91 (Minn. 1996), both parties’ appraisers deducted a stigma factor from the unimpaired value of contaminated property. The taxpayer’s expert relied upon a market case study of fourteen improved industrial properties sold following contamination cleanup. The municipality’s expert relied upon published studies and an article in the Appraisal Journal containing a market study of eight properties. The court found the municipality’s expert’s data out of date and unreliable, since he did not do any market research himself. 1995 WL 128511 at *3. The court held that the taxpayer’s expert’s data was current and reliable, and thus upheld a stigma factor of 50% in the amount indicated by the taxpayer. Ibid.
Similarly, in Almor Corp. v. Hennepin, 1996 WL 112634 (Minn. Tax 1996), aff'd 566 N.W.2d 696 (Minn.1997), the taxpayer’s expert relied upon a market case study that was published in the Appraisal Journal of fourteen improved industrial properties sold following contamination cleanup. Of those fourteen eases, the court rejected all but six for various reasons. 1996 WL 112634 at *5. The municipality’s expert relied upon a market case study of four contaminated sales, four mortgage case studies, and evidence that properties had been constructed near the contaminated property site. The court disregarded all of these sales since there was no evidence that the sales had significant concentrations of soil contaminates and therefore were not comparable to the subject property. Ibid. The court held that the taxpayer’s expert’s remaining six eases were current and reliable, and thus upheld a stigma factor in the amount of 33% indicated by the taxpayer. Ibid.
*290 Mr. Hedden offered four transactions to justify his 10% stigma adjustment. Improved Sale No. 1 is a 3 acre contaminated industrial property with a 28,800 sq. ft. building. The property was listed at $750,000, but sold for $505,000. Mr. Hedden concluded that the property suffered a diminution in value owing to the environmental impairment of 53.3%. Improved Sale No. 2 is a 4.4 acre industrial property adjacent to a contaminated parcel. The sale price of $3,600,000 was reduced by $200,000 to reflect for potential leaching of contamination from the adjoining property. Mr. Hedden concluded that the property suffered a diminution in value owing to the environmental impairment of 5.5%. Improved Sale No. 3 is a 3.78 acre contaminated industrial property with a 45,158 sq. ft. building. The property was purchased for $900,000. The purchaser incurred additional costs because of the environmental impairment. The purchaser occupies half of the building, while a tenant occupies the other half. Mr. Hedden concluded that the property suffered a diminution in value owing to the environmental impairment of 33.6%. Improved Sale No. 4 is a 26 acre industrial property with a 200,000 sq. ft. building. The purchase was for $250,000 plus the cost to clean up the property (approximately $1.85 million).
Sale No. 1 is extremely small compared to the subject properties, which consist of over 16 acres and include a 197,000 sq. ft. building. Also, the sale took place over three years prior to the assessment date of the subject parcels, and thus is not strong support for Mr. Hedden’s conclusion of a 10% stigma factor. Sale No. 2, unlike the subject properties, was not itself contaminated, nor was the new owner liable for cleanup costs associated with the contamination. In addition, this property is substantially smaller than the subject parcels. Furthermore, the sale took place over five years prior to the assessment date of the subject parcels. Therefore, this sale is not similar enough to the subject parcels to support Mr. Hedden’s stigma factor. Sale No. 3 is also considerably smaller than the subject parcels. In addition, unlike the subject parcels, half of this property is rented to a third party, who does not incur costs from the environmental remediation. Thus, this property is also not strong support for Mr. Hedden’s *291 stigma factor. Mr. Hedden did not provide a conclusion of the diminution in value owing to the environmental impairment for Sale No. 4, and thus this property cannot be cited as support for his estimated stigma of 10%.
Only one out of the four comparable sale properties required the purchaser to assume the costs of the environmental cleanup. All but one of the comparables are significantly smaller than the subject parcels, and Mr. Hedden failed to complete the analysis on the only sale similar in size and did not provide a stigma value for that property. The data presented gives extremely weak support for a range of stigma percentages from 5.5% to 53.3%, but gives no support to Mr. Hedden’s conclusion of a 10% stigma factor in this ease. Thus, the failure of plaintiff to quantify a stigma value through its reports and testimony during trial prevents this court from allowing a stigma adjustment to be included. CDS, supra, 216 B.R. at 155, n. 17.
In addition, Mr. Hedden did not isolate the “stigma” factor from actual contamination. Instead, he has combined stigma and clean up costs and since in this case we know the clean up costs, there is no factual basis to take an extra deduction for stigma. Evidence must be definite, positive and certain in quality and quantity in order to disturb the assessment which is presumptively correct. Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952); see also, Pantasote Co. v. City of Passaic, 100 N.J. 408, 413, 495 A.2d 1308 (1985). The evidence of the amount of a stigma deduction in this case is not up to the standard of Aetna, supra, and Pantasote, supra, and amounts to a net opinion.[2]
III.
ENTREPRENEURIAL PROFIT
I conclude that the appropriate adjustment for entrepreneurial profit is 10%.
*292 The theoretical basis for an entrepreneurial profit adjustment has been authoritatively described in the generally accepted compendium of appraisal practice as follows:
When the direct and indirect costs of developing a property are used to provide an indication of value, the appraiser must also include an economic reward sufficient to induce an entrepreneur to incur the risk associated with a budding project. For a completed project at stabilization, the difference between the sum of direct and indirect costs and the market value of the property is the entrepreneurial profit (or loss) realized...
In other words, to solve for profit the appraiser may compare market value and the value indicated by the cost approach without profit. Whether or not a profit is actually realized depends on how well the entrepreneur has analyzed the market demand for the property, selected the site, and constructed the improvements. In the ease of income-producing properties, the profit realized will also depend on the entrepreneur’s ability to obtain the proper tenant mix and negotiate leases.
[The term] entrepreneurial profit [is] a market derived figure that represents the amount an entrepreneur receives for his or her contribution to a project and risk; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represents the entrepreneur’s compensation for the risk and expertise associated with development. [American Institute of Real Estate Appraisers, The Appraisal of Real Estate 360 (12th ed.2001)J
Entrepreneurial profit is compensation for risk and expertise associated with development. B.F. Goodrich Co. v. Oldmans Tp., 17 N.J.Tax 114, 122 (Tax 1997), aff'd 323 N.J.Super. 550, 733 A.2d 1204 (App.Div.1999). Therefore, a realistic cost approach must recognize adequate compensation to the entrepreneur to induce him to organize the project. Beneficial Facilities Corp. v. Peapack & Gladstone Bor., 11 N.J.Tax 359, 381 (Tax 1990), aff'd 13 N.J.Tax 112 (App.Div.1992), certif. den., 130 N.J. 397, 614 A.2d 619 (1992). It is necessary to include a figure which reflects the time, effort, and incidental expense of the owner in the development of the property. Ibid.
Plaintiffs expert, Mr. Hedden, utilizes a 25% entrepreneurial incentive in his analysis. During his testimony, Mr. Hedden acknowledged that ordinarily a 10% entrepreneurial incentive is appropriate to use in the cost method of valuation, but insisted that since the risk was so much greater in the case of contaminated properties the entrepreneurial incentive percentage should be higher. Mr. Hedden testified that he chose 25% based upon *293 plaintiffs experience and expectations as well as Ms own experience. Mr. Hedden, however, did not produce any market data supporting his conclusion.
The Tax Court has recognized an increment for entrepreneurial profit in valuation of many kinds of property. Beneficial Facilities Corp., supra, at 381 (corporate headquarters complex); Glen Points Assocs. v. Teaneck Tp., 10 N.J.Tax 506, 515-16 (Tax 1989) (office buildings); McGinley Mills v. Phillipsburg, 9 N.J.Tax 508, 517 (Tax 1988) (user-developed industrial facility); Abe Schrader Corp. v. Secaucus, 8 N.J.Tax 390, 395 (Tax 1986) (warehouse/retail outlet building); Lawrence Assocs. v. Lawrence Tp., 5 N.J.Tax 481, 534-38 (Tax 1983) (shopping center). In the earliest of these cases, Lawrence Assocs., the appraisers agreed that 10% was an appropriate allowance. The later cases continue to employ that factor as a useful and convement measure where market analysis warrants an adjustment. Texas Eastern Transmission Corp. v. East Amwell, 13 N.J.Tax 24, 41 (Tax 1992), aff'd 18 N.J.Tax 126 (App.Div.1999).
Since plaintiff has not produced sufficient evidence to support a finding that a higher entrepreneurial profit is warranted in this case, I hold that the most commonly employed 10% figure is appropriate.
VI.
CLEAN-UP COSTS
Finally, I conclude that the projection period for the cleanup of the contamination should be five years.
Plaintiffs expert, Mr. Hedden, testified that he used a projected period of two years for the cleanup of the property in his analysis. He indicated that if the cleanup was slower then the costs of cleanup as discounted to present value would be less. He admitted that at that time, more than two years had elapsed since the cleanup began and that cleanup was not yet completed. During cross examination, Stuart Schooler, plaintiffs managing partner, admitted that two years for cleanup was unrealistically short.
*294 Plaintiffs exhibit P-1 included a Statement of Work for Groundwater Investigation and Remediation, which provided a Schedule of Value that indicated that all activities would be completed in 1581 days (4.3 years) and all reporting completed in 1641 days (4.5 years). Thus, remediation would take at least four and a half years to complete. Plaintiffs exhibits 7, 8 and 9 are letters of credit and insurance for groundwater and soil remediation as well as for real estate pollution liability. All three policies have an insured period from June 29, 1999 to June 29, 2004, a five-year period. Thus, it appears that plaintiff anticipated the remediation process to take approximately five years to complete.
For this reason, a five-year period of remediation should be utilized in the cost analysis.
VII.
VALUATION
There can be no question that uncontaminated land is worth more than contaminated land. Therefore, as contaminated land is cleaned up, the value of the land increases. The question is, as a matter of law, how should this capitalization of the cleanup costs affect the fair market value of the property. The Supreme Court of New Jersey has held that the cleanup costs cannot be deducted dollar for dollar from the unimpaired value of the property. Inmar Assocs., Inc. v. Carlstadt, supra, 112 N.J. at 607-608, 549 A.2d 38. In Badische v. Kearny, 17 N.J.Tax 594 (App.Div.1998), the corporate taxpayer challenged the tax assessment of its environmentally contaminated chemical plant property. The court noted that the principles defined in Inmar, supra, were controlling. Id. at 597, 549 A.2d 38.
Inmar gives us the following principles for accessing the value of unused, contaminated property that is subject to mandatory cleanup at the owner’s expense, and at estimated but undetermined cost: (1) the cost, even if known or reasonably estimated, cannot reduce the market value on a dollar-for-dollar basis; (2) market value is affected and the effect cannot be ignored, because the New Jersey Constitution requires assessment at true value; (3) non-classical, flexible approaches to valuing such property are required; and (4) treating the cost of cleanup as a depreciable capital improvement “contains the seeds of useful doctrine.”

*295
[Ibid.]

The court went on to note that the Supreme Court in Inmar clearly stated that cleanup costs should not be directly deducted from the value of the land. Ibid. “While the Court recognized that cleanup costs should not be ignored in the assessment process, it did not formulate any particular method for such calculations, leaving to the competence of the appraisal community the sound measure of that adjustment.” Id. at 597-598, 549 A.2d 38.
Mindful of the Supreme Court’s admonition in Glen Wall Assoc. v. Wall Tp., 99 N.J. 265, 280, 491 A.2d 1247 (1985), to “be cognizant of expense incurred by litigants in engaging an expert”, and aware that sometimes the factual circumstances of a case, while unusual, require an appropriate and pragmatic application of the existing and relevant statutory scheme, Jaydor Corp. v. Millburn Tp., 18 N.J.Tax 655, 657-658 (App.Div.2000), I conclude that the appropriate way to deal with the contaminated property in this case is to discount over five years the remaining cleanup costs rather than allowing all of it to be deducted in every year once the cleanup has begun. To allow continued deductions after the money has been expended ignores the reality that after money is expended the property is worth more.
Both parties have agreed that the value of the unimpaired properties as of October 1, 1999 is $1,800,000 and the estimated cleanup costs for the properties is $1,460,177. The only interest rate on record is the 9% utilized by Mr. Hedden, so that rate will be used by default. $1,135,915 is the present value of the cleanup costs over a five-year period, assuming an interest rate of 9% and level expenditures of approximately $292,000 per year over a five year period.
Mr. Hedden applies the entrepreneurial profit percentage to $1,800,000, or the cost clean. This is incorrect. Entrepreneurial profit should be a percentage of the entrepreneur’s investment. In this case, the entrepreneur’s investment is equal to t]je sum of the present value of the cleanup costs, acquisition costs of $393,069, and the $100 purchase price, for a total investment of *296 $1,529,084. Therefore, the entrepreneurial profit of 10% equals $152,908.
The value of the unimpaired properties of $1,800,000 minus the present value of the cleanup costs over a five-year period ($1,135,-915) minus an entrepreneurial incentive ($152,908) leaves a value of the two parcels impaired as of October 1, 1999 of $511,176.[3]
For the 2000 tax year, the Chapter 123 ratio for Metuehen was 91.95% with an upper limit of 100% and a lower limit of 78.16%. The property tax assessments for the 2000 tax year for the two parcels of land total $3,089,900. Dividing the assessment imposed by the fair market value indicates a ratio of 604.47%, far above the upper limit of the Chapter 123 ratio. Therefore, the assessment must be reduced. Multiplying the fair market value of the properties by the applicable Chapter 123 ratio leaves a proper assessment of $470,026 for the tax year 2000. See the attached Table summarizing all calculations.
VIII.
SUMMARY OF CONCLUSIONS
In sum, the parties agreed that the value of the properties unimpaired as of October 1, 1999 is $1,800,000 and that the clean up costs for the properties would be $1,460,177. Plaintiffs failure to offer adequate proof for a stigma reduction to the value of the property precludes this court’s allowance of a stigma adjustment. An entrepreneurial profit of 10% is warranted based on prior decisions of this court and plaintiffs failure to justify a higher percentage. The fair market value of the two parcels as of October 1,1999 is $511,176. Since the assessment exceeds the fair market value the amount will be reduced to the value times the Chapter *297 123 ratio for that year. See, Passaic Street Realty Assoc., Inc. v. Garfield City, 13 N.J.Tax 482 (Tax 1994) (explaining the operation of N.J.S.A. 54:51A-6). The fair market value of $511,176 times the Chapter 123 ratio of .9195 equals $470,026, rounded to $470,000. The attorneys will notify the court pursuant to R. 8:9-3 how the assessment should be allocated between the two parcels and between land and improvements within twenty days. If they cannot agree, a hearing pursuant to R. 8:9-4 will be held on April 30, 2004. The parties will exchange and file proposed allocations five days prior to that hearing.
TABLE REFERRED TO IN METUCHEN I, LLC V. METUCHEN
Present Value of Clean Up Costs as of October 1,1999
Total Estimated Clean Up Costs $ 1,460,177.00
Clean Up Projection Period (years) 5
Average Annual Clean Up Costs $ 292,035.40
Cost of Funds (Interest Rate) 9%
Year 1 $ 267,922.33
Year 2 $ 245,800.36
Year 3 $ 225,504.77
Year 4 $ 206,885.18
Year 5 $ 189,802.86
Present Value of Clean Up Costs 10/1/99 $ 1,135,915.49
Value of Land and Improvements as of October 1,1999
Value of Properties Unimpaired $ 1,800,000
Present Value of Clean Up Costs $ 1,135,915.49
Purchase Price $ 100.00
Acquisition Costs $ 393,069.00
Total Investment $ 1,529,084.49
Entrepreneurial Incentive (10%) $ 152,908.45
Value Unimpaired $ 1,800,000.00
Less Present Value of Clean Up Costs $ 1,135,915.49
Less Entrepreneurial Incentive $ 152,908.45
Fair Market Value of Properties $ 511,176.06
Assessments Imposed $3,089,900.00
Fair Market Value of Properties $ 511,176.06
Ratio 604.47%
Chapter 123 Lower Limit 78.16%
Chapter 123 Upper Limit 100.00%
Chapter 123 Ratio 91.95%
2000 Assessment (FMV x Ch. 123 ratio) $ 470,026.38

 In this opinion, parentheses around a dollar amount indicates a negative number.

 It should be noted that this court's ultimate conclusion of value, $511,176, results in a combined cleanup and stigma reduction from an agreed upon $1,800,000 value clean of 71.6%

 Assuming that the plaintiff chooses not to clean up the property it will have invested $393,169 (acquisition costs of $393,069 plus the purchase price of $100) and have an anticipated entrepreneurial profit of $152,908 for a total of $546,077, not far from the $511,176 value determined. Not that this calculation “proves" anything except that the ultimate conclusion of value makes sense. This indicates that Plaintiff, a rational investor, has invested a rational amount of money.