DeALMEIDA, P.J.T.C.
This is the court’s opinion after trial in the above-referenced matters challenging the local property tax assessment on plaintiffs real property for tax year’s 2010 and 2011. For the reasons stated more fully below, the assessment for each year is reduced to a nominal amount. The subject property is a small, vacant parcel contaminated with toxic compounds as the result of now-abandoned industrial activities undertaken on the property for many years. The parcel contains hundreds of wells, along with associated underground piping and equipment, to remediate and monitor soil and groundwater contamination. The wells cannot be disturbed for an indefinite period, in light of the fact that the remediation is not complete and the property continues to emit toxic vapors. In addition, more than 6,000 square feet of the property is covered with a concrete slab, which previously served as the floor of the manufacturing facility. The slab serves as a cap for the toxic vapors and also cannot be disturbed for an indefinite period. There is very little of the property that is not encumbered with a well or the concrete slab. These restrictive features effectively preclude development of the parcel for the foreseeable future and the continuing and indefinite nature of the threat from contaminants on the property renders it unmarket *293 able. The court accepts expert testimony offered at trial that until the property is remediated and the restrictions with respect to the wells and concrete slab are removed, events which cannot reasonably be expected in the foreseeable future, the property has no value in the marketplace. A nominal assessment, therefore, is warranted for each tax year.
I. Findings of Fact
The following findings of fact and conclusions of law are based on the evidence and testimony admitted at trial.
Plaintiff Methode Electronics, Inc. (“Methode”) is the owner of real property in an industrial neighborhood of defendant Willing-boro Township. The property, which is slightly more than three acres, is designated in the records of the municipality as Block 13, Lot 8.02 and is commonly known as 10 Industrial Way.
Beginning in 1969, Methode manufactured printed circuit boards and automotive airbag parts in a building on the property. In 1988, volatile organic compounds were discovered in the groundwater at the property during a routine inspection. This discovery resulted in additional investigations by the Department of Environmental Protection (“DEP”) which revealed further contamination on the property, as well as contamination which migrated from the subject to adjoining parcels not owned by plaintiff. The contaminants found in the soil and in the groundwater at depths of fourteen feet include trichloroethylene, arsenic, copper, lead, and nickel. In addition to polluting the soil and groundwater, these dangerous compounds pose the threat of toxic vapors seeping into the air and structures on the property and nearby parcels.
In 1993, Methode and the DEP executed a Memorandum of Agreement to continue investigative work at the property. In 1995, a groundwater treatment system was installed at the property. The system includes 57 wells to permit water to be pumped into the ground and 134 soil vapor extraction wells to extract the toxic vapor resulting from the pumping process. The wells include a network of connecting underground pipes both for the provision of power and for the movement of water. In addition, a *294 small building was constructed on the property to house groundwater treatment equipment.
In 1999, Methode ceased manufacturing operations on the property, triggering a statutory obligation to remediate the environmental contamination under the Industrial Site Recovery Act (“ISRA”), N.J.S.A. 13:1K-6 to -14. No business activities have taken place on the property since 1999.
As of October 1, 2009 and October 1, 2010, the relevant valuation dates, the building in which Methode conducted manufacturing had been demolished, except for an approximately 6,800 square foot concrete slab that served as the floor for the facility. Pursuant to its remediation plan, Methode left the concrete slab in place to serve as a cap preventing the off-gassing of toxic vapors from soil and groundwater. Most of the portion of the parcel not under the concrete slab is paved and previously served as the parking lot and loading area of the facility.
In addition, as of the relevant valuation dates, the pavement and other areas of the parcel were peppered with wells and other improvements associated with the property’s remediation. Along with the remediation wells and other improvements described above, 14 additional pumping wells with associated vaults and piping subsequently were installed on the property. Fifty-three monitoring wells are distributed throughout the three-acre parcel and offsite to gather evidence with respect to the continuing threat of vapor intrusion from contamination at the property. Some wells are flush with the ground, others rise one or two feet above the ground. The wells are not concentrated in a particular corner of the small parcel. They are, instead, spread throughout the plot. A plat of monitoring wells at the subject admitted into evidence at trial demonstrates that very little of the subject property is clear of a monitoring well or the concrete slab that serves as a vapor cap. Credible expert testimony established that the wells and concrete cap make it impossible to design a building for the parcel that would be financially feasible and in a shape that would be useable.
*295 Notably, the subject property is in close proximity to both Hill Creek and Crystal Lake. The fact that the contamination at the subject is in the groundwater raises the obvious threat of migration of the toxic materials to these bodies of waters. The surrounding parcels house industrial facilities. A parking lot used by the local board of education and charter schools for the storage of school buses adjoins the property. The record contains credible evidence that concerns have been raised in the past with respect to toxic vapors infiltrating the school buses.
As of both valuation dates, the following restrictions applied to the property with respect to the contamination:
1. A deed notice required the concrete footprint of the former manufacturing building to remain undisturbed. In the event that the slab is disturbed during the course of remediation, it must be restored to prevent contact with receptors, unless the underlying toxic materials are removed to the satisfaction of the DEP;
2. Access to the 53 monitoring wells must be maintained at all times for routine sampling and monitoring;
3. The system of pumping wells and associated improvements will be operational for an indefinite period — certainly several years and possibly decades in duration;
4. The dangerous compounds identified during the environmental investigations remain present in both the soil and the groundwater and continue to pose a threat of toxic vapor intrusion. The contamination present on the valuation dates includes contamination of groundwater beyond the subject property to neighboring parcels (where monitoring wells have been installed); and
5. The property remains under the jurisdiction of the DEP and remains on a list maintained by federal environmental authorities for priority remediation.
The property owner submits quarterly reports of its expenses associated with remediation of the contamination. By 2009, Meth-ode spent $6 million on its remediation efforts at the property. By 2012, that figure had risen to $8.5 million. As of the valuation *296 dates, total remaining remediation costs were estimated at between $2,386,000 and $3,714,000. In addition, in 2009 the property owner was in possession of an estimate that it would be necessary to spend between $120,000 and $150,000 per year to maintain the required system of wells and associated equipment for the indefinite future. This figure does not include the projected cost of sampling from the monitoring wells.
The municipality implemented a revaluation for tax year 2010. The subject property was assessed as follows:
Land $382,600
Improvement $ 22.000
Total $404,600
Because the assessment was set during a revaluation, it is presumed to reflect 100% of the true market value of the subject property.
Plaintiff appealed the tax year 2010 assessment to the Burlington County Board of Taxation. After a hearing, the county board issued a Judgment reducing the assessment as follows:
Land $222,600
Improvement $ 22.000
Total $244,600
Plaintiff filed a timely Complaint in this court challenging the Judgment of the county board with respect to tax year 2010. The municipality did not file a counterclaim.
For tax year 2011, the subject property was again assessed as follows:
Land $382,600
Improvement $ 22.000
Total $404,600
*297 The Chapter 123 average ratio for the municipality for tax year 2011 is 95.21%. The implied true market value of the subject property is, therefore, $424,955 ($404,600 - .9521 = $424,955).
Plaintiff appealed the tax year’ 2011 assessment to the county board. On July 26, 2011, the board entered a Judgment affirming the assessment without prejudice, given the pendency of the tax year 2010 appeal in this court.
Plaintiff thereafter filed a timely Complaint in this court challenging the Judgment of the county board with respect to tax year 2011. The municipality did not file a counterclaim.
At trial, the taxpayer presented as a fact witness an environmental specialist who is the manager of the remediation project at the property. He explained Methode’s past and current remediation efforts and the continuing restrictions associated with government-mandated remediation and monitoring of contamination at the parcel. In addition, plaintiff presented an expert real estate appraiser who offered the opinion that the subject property cannot be developed in any meaningful fashion in its present state, has no realistic possibility of being fully remediated at any identifiable future date, and poses the threat of liability to any potential purchaser from the property’s continued capacity to produce toxic vapors. As a result of these conclusions, the expert opined that the property has no true market value and should be assessed for the nominal amount of $1.
The municipality also presented an expert real estate appraiser. He offered the opinion that the current use of the property — being held for potential development once fully remediated — is its highest and best use. Based on this conclusion, the expert used the cost approach to reach the conclusion that the land had a true market value of $135,000 per acre, or $413,235 on each of the valuation dates. From this amount the expert discounted $160,500, which he characterized as an adjustment to account for contamination on the property, but which actually reflected the local property taxes and local utilities charges for a projected seven-year holding period until the property is fully remediated. This resulted in a land value of $252,700. He also opined that the *298 800-foot structure protecting the groundwater treatment equipment and the asphalt lot had a total depreciated value of $81,915. When combined, these figures resulted in an opinion of value of $334,600 for each of the valuation dates.
II. Conclusions of Law
The court’s analysis begins with the well-established principle that “[original assessments ... are entitled to a presumption of validity.” MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J.Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as follows:
The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be “definite, positive and certain in quality and quantity to overcome the presumption.”
Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413, 495 A.2d 1308 (1985) (citations omitted)).
The presumption of correctness arises from the view “that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law.” Pantasote, supra, 100 N.J. at 413, 495 A.2d 1308 (citing Powder Mill, I Assocs. v. Township of Hamilton, 3 N.J.Tax 439 (Tax 1981)); see also Byram Twp. v. Western World, Inc., 111 N.J. 222, 544 A.2d 37 (1988). The presumption remains “in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity.” Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517, 545 A.2d 746 (1988).
“The presumption of correctness ... stands, until sufficient competent evidence to the contrary is adduced.” Little Egg Harbor Twp. v. Bonsangue, 316 N.J.Super. 271, 285-86, 720 A.2d 369 (App.Div.1998) (citation omitted); Atlantic City v. Ace Gam *299 ing, LLC, 23 N.J.Tax 70, 98 (Tax 2006). “In the absence of a R. 4:37-2(b) motion ... the presumption of validity remains in the ease through the close of all proofs.” MSGW Real Estate Fund, LLC, supra, 18 N.J.Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence “as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion.” Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535, 666 A.2d 146 (1995)). In order to overcome the presumption, the evidence “must be ‘sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.’ ” West Colonial Enters., LLC v. City of East Orange, 20 N.J.Tax 576, 579 (Tax 2003)(quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J.Tax 405, 408 (Tax 1999), aff'd, 18 N.J.Tax 658 (App.Div.), certif. denied, 165 N.J. 488, 758 A.2d 647 (2000)).
Only after the presumption is overcome with sufficient evidence at the close of trial must the court “appraise the testimony, make a determination of true value and fix the assessment.” Rodwood Gardens, Inc. v. City of Summit, 188 N.J.Super. 34, 38-39, 455 A.2d 1136 (App.Div.1982). If the court determines that sufficient evidence to overcome the presumption that the assessment is correct has not been produced, the assessment shall be affirmed and the court need not proceed to making an independent determination of value. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 311-12, 604 A.2d 580 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J.Tax 698, 703-04 (App.Div.1996).
The court concludes that plaintiff produced sufficient evidence to overcome the presumption of validity attached to the assessments and county board Judgments. If taken as true, the *300 opinion of plaintiffs expert and the facts upon which he relied, create a debatable question regarding the correctness of the assessment in each tax year sufficient to allow the court to make an independent determination of the value of plaintiffs property. The expert opined that on each valuation date the subject property had no true market value. This opinion was based on the undisputed fact that the property is contaminated with dangerous chemicals, is spotted with wells and associated equipment to monitor toxic vapors seeping from contaminated soil and groundwater, has an approximately 6,800-square-foot concrete slab capping poisonous vapors that cannot be disturbed, and would be a potential liability to any purchaser. Giving every positive inference to this evidence, as is required at this juncture, plaintiff has created a doubt in the court’s mind with respect to the validity of the assessments on the property, which reflect a true market value of several hundred thousand dollars.
The court’s inquiry, however, does not end here. Once the presumption is overcome, the “court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence.” Ford Motor Co., supra, 127 N.J. at 312, 604 A.2d 580 (quotations omitted). “[Although there may have been enough evidence to overcome the presumption of correctness at the close of plaintiffs case-in-ehief, the burden of proof remain[s] on the taxpayer throughout the entire case ... to demonstrate that the judgment under review was incorrect.” Id. at 314-15, 604 A.2d 580 (citing Pantasote, supra, 100 N.J. at 413, 495 A.2d 1308).
The contamination on the subject property is a critical factor in the determination of its true market value. Our Supreme Court has unequivocally held that environmental contamination has an impact on property valuation for local property tax purposes. Inmar Assocs., Inc. v. Borough of Carlstadt, 112 N.J. 593, 549 A.2d 38 (1988). In that case, the Court considered appeals of local property tax assessments by two owners of contaminated industrial properties. In one case, the property was in use as an asphalt siding plant on the relevant valuation dates. The owner contemplated that it might remove the plant from service and sell the *301 property and was aware that a recently enacted statute would require the property to be cleaned prior to sale. 112 N.J. at 596, 549 A.2d 38. A principal of the taxpayer “estimated” the cost of the cleanup “based on an inspection of the property but without a sampling study.” Id. at 597, 549 A.2d 38. In addition, the taxpayer presented “no evidence of a cleanup plan approved by the [DEP].” Ibid. The parties stipulated to a value for the property as if clean. The taxpayer argued that the property tax assessment should be calculated by deducting from the stipulated value clean the taxpayer’s estimated cleanup cost. Ibid.
In the second ease before the Court in Inmar, the taxpayer owned a parcel on which its long-term tenant maintained an industrial solvent recovery operation. The tenant abandoned the property, leaving sixty-seven tanks containing various chemical wastes and solvents leaking into the soil. Id. at 598, 549 A.2d 38. The DEP filed suit against the property owner and tenant to compel cleanup of the site, which had also been placed on the federal Superfund list. See 42 U.S.C. §§ 9601 to 9675 (Comprehensive Environmental Response, Compensation, and Liability Act of 1980). The taxpayer estimated the cost to clean up the property, but
was unable to ascertain the full extent of the cleanup costs at the assessment date because neither the exact degree of contamination nor the level to which the contamination would have to be cleaned up on the site had been determined by any government agency.
[Id. at 598-599, 549 A.2d 38.]
The taxpayer argued that the property was unmarketable and therefore should be regarded as having no value, or, in the alternative, that the cleanup costs incurred by the taxpayer should be deducted dollar for dollar from the value of the property as if clean. Id. at 599, 549 A.2d 38.
Recognizing that all property in the State must be assessed at trae value, see N.J.S.A. 54:4-23 (the tax assessor must “determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1____”), the Court held that where environmental contamination drives “down the value of commercial property potentially subject to *302 cleanup costs, the effect of those market forces cannot be ignored in the assessment process simply because it would be counter to the environmental policy.” Id. at 606, 549 A.2d 38 (footnote omitted).
The exact role that contamination plays in the assessment valuation process, however, was not established by the Court in Inmar. “Where exactly environmental cleanup cases fit in such a spectrum was not fully developed” by case law, the Court noted. Id. at 605, 549 A.2d 38. Justice O’Hern, writing for a unanimous Court, however, eliminated one approach:
One thing is certain: the methodology for resolving the question is not simply to deduct the cost of the cleanup from a putative value of the property. That would reflect only the cost accounting of the current owners.
* * *
An owner’s expenditures of cost are “never conclusive on the question of value for tax purposes;” Dworman v. Borough of Tintan Falls, 1 N.J.Tax 445, 455 (Tax Ct.1980), aff'd, 180 N.J.Super. 366, 3 N.J.Tax 1 [434 A.2d 1134] (App.Div.) certif. denied, 88 N.J. 495, 443 A.2d 709 (1981)(quoting Borough of Haworth v. State Board of Tax Appeals, 132 N.J.L. 306, 308 [40 A.2d 353] (1945)); and “[m]ere costliness, therefore, cannot rationally be made the basis of exemption from taxation.” CPC Int’l v. Borough of Engelwood [Englewood] Cliffs, 193 N.J.Super. 261, 268 [473 A.2d 548] (App.Div.1984)(quoting Turnley v. City of Elizabeth, 76 N.J.L. 42, 44 [68 A. 1094] (Sup.Cit.1908) [ (Sup.Ct.1908) ]).
[Id. at 605, 549 A.2d 38.]
Notably, the Court’s analysis included several references to the fact that statutes mandating the remediation of environmental contamination were relatively new on the valuation dates at issue in Inmar and that market evidence of the effects of those laws was not yet available. As the Court noted, “the question that remains to be tested is whether a strong environmental cleanup policy will drive real estate values up or down.” Id. at 606, 549 A.2d 38. The Court suggested that in the absence of evidence of market data, contaminated properties might best be treated as special purpose properties “using a measure of flexibility that will aid in the determination of’ true value. Ibid. “Generally, when ‘there is no market’ for the property, a property may be so classified.” Ibid. (quoting Sunshine Biscuits, Inc. v. Borough of Sayreville, 4 N.J.Tax 486, 495 (Tax 1982)).
*303 Moreover, the Court recognized that contaminated property for which there is no market may have “a distinct ‘value in use’ to the owner so long as the owner continued to operate the facility. Hence, when property is in use, normal assessment techniques will remain an appropriate tool in the appraisal process.” Id. at 607, 549 A.2d 38. In addition, the Court noted that “the seeds of useful doctrine” were present in the suggestion that “the cost to cure the contaminated property could be treated as a capital improvement, which can be depreciated over the beneficial life of the property.” Ibid.
With respect to the asphalt plant, the Court affirmed a lower court decision upholding the assessment without a reduction for environmental contamination because the property was in use on the valuation dates. The appeal concerning the property on which the industrial activity resulting in the contamination had been abandoned was remanded for a reduction in the assessment to account for environmental contamination. Id. at 609-610, 549 A.2d 38.
In Badische Corp. (BASF) v. Town of Kearny, 288 N.J.Super. 171, 672 A.2d 186 (App.Div.1996), the court reviewed a challenge to an assessment on contaminated industrial property. The taxpayer had ceased to use the property prior to the valuation date, triggering a statutory cleanup obligation. The taxpayer also submitted a site evaluation and sampling plan to the DEP, began sampling, and received test results prior to the valuation date. Id. at 179, 672 A.2d 186. As a result of the testing, an officer of the taxpayer estimated the amount of contamination and the cost of remediation. Id. at 179-180, 672 A.2d 186. A $10 million reserve was created to cover the estimated costs of cleanup. Id. at 180, 672 A.2d 186. The taxpayer conceded that the $10 million estimate was subject to change based on the cleanup level negotiated with the DEP. As of the trial date in this court, the taxpayer had not submitted a cleanup plan to the DEP, nor had the DEP placed any restrictions on the use of the buildings on the property. Ibid. The Tax Court found that the taxpayer had not met its burden of proof with respect to establishing cleanup costs and therefore did *304 not adjust the assessed value of the property for environmental contamination. Id. at 181, 672 A.2d 186.
The Appellate Division reversed. The court held that the taxpayer had produced sufficient evidence to establish that an adjustment to the assessed value was warranted for environmental contamination. The court explained,
[a]s of the assessment date, BASF had submitted a detailed [report] to the DEP documenting the environmental history of the subject property. A sampling plan setting forth the method of testing to determine the extent of contamination was submitted and approved by the DEP. Soil and groundwater testing were substantially complete, and some results were available enabling BASF to estimate the amount of contamination and the cost of cleanup at $10 million. BASF established a $10 million reserve to cover these costs. These proofs at least equal, if not surpass, those submitted by Inmar and found by the New Jersey Supreme Court sufficient to warrant remand. We therefore remand to the Tax Court to adjust the value of the subject property due to environmental contamination.
[Id. at 183, 672 A.2d 186.]
The court did not provide guidance with respect to how the evidence produced by the taxpayer should be used to calculate an adjustment to account for contamination, leaving that question to this court’s “specialized knowledge and expertise.” Id. at 184, 672 A.2d 186.
In Metuchen I, LLC v. Borough of Metuchen, 21 N.J.Tax 283 (Tax 2004), the assessment at issue concerned a parcel which was contaminated with pollutants as a result of the operation of a manufacturing facility. The industrial operations had been shut down and the property sold. Id. at 286. The new owner, who had assumed responsibility for all cleanup costs, appealed the assessment on the property, seeking a reduction to the assessed value based on cleanup costs, for which it had secured an estimate. Ibid. The parties stipulated to the value of the property as if clean and the “only issue for determination [was] how that value should be reduced to take into account the contamination.” Ibid.
The court determined that “the appropriate way to deal with the contaminated property in this case is to discount over five years the remaining cleanup costs rather than allowing all of it to be deducted in every year once the cleanup has begun.” Id. at 295. The court explained that “[t]o allow continued deductions after the money has been expended ignores the reality that after money is *305 expended the property is worth more.” Ibid. The court found that a five-year discount period was appropriate because the evidence in the record, including letters of credit, insurance and cost estimates, established that the owner contemplated completion of the remediation process over five years.
Another approach to determining the true market value of contaminated property was taken in Orient Way Corp. v. Township of Lyndhurst, 27 N.J.Tax 361 (Tax 2013), aff'd, 28 N.J.Tax 272 (App.Div.2014), certif. pending. In that ease, the owner of contaminated former industrial property, aware of its statutory obligation to remediate the pollution, secured an estimate of cleanup costs from environmental experts. Id. at 369. An entity interested in assuming responsibility for remediation of the property with the intention to redevelop the parcel engaged in arms’ length negotiations for the purchase of the property. Both the property owner, a willing seller, and the purchaser, a willing buyer, were aware of the known extent of the contamination, a statutory obligation to remediate the property, and the estimated cost of the clean-up. With this information in hand, the two parties reached a negotiated selling price for the property shortly before one of the relevant valuation dates. Ibid.
This court concluded that use of discounting estimated contamination costs recognized in Inmar, Badische Corp., and Metuchen I, was not the best approach for determining value where a sophisticated seller and a sophisticated buyer, aware of contamination and an estimate of clean-up costs, freely negotiated a sale price for the property. As the court explained “[t]here is no need to resort to the discounting of estimated remediation costs or similar measures to determine the effect on value of the subject property’s contamination in this ease. Here, the market has performed that task.” Id. at 390-91. The court adopted the sales price as the true market value of the property.
In this ease, the court is presented with facts that depart from those before the court in the precedents cited above. The assumption underlying the holdings supporting the discounting of projected remediation costs — in Inmar, Badische Corp. and Metu- *306 chen I — is that the subject property could be remediated to the point that it could be used or developed and, thus, have market value. It makes sense, therefore, to determine taxable value by formulating a true market value as if the property were clean and discount over the estimated remediation period the remediation costs to arrive at a taxable value. In Orient Way, it was plain that the market viewed the property as potentially subject to development after remediation. A willing, sophisticated buyer, aware of the contamination and the estimated cost of remediation, and intending to redevelop the property once it was clean, negotiated a purchase price.
Here, the evidence establishes that it is not reasonably likely that the subject property will be able to be used or developed at any point in the foreseeable future. This conclusion derives from a property-specific analysis relying on the following facts: (1) the subject property is relatively small and little of the parcel is not burdened with a remediation well, monitoring well, or the concrete vapor cap; (2) the regulating authority, the DEP, has determined that the remediation and monitoring wells, along with the concrete cap, must remain in place, functioning and accessible, for an indeterminate period, of years and possibly decades duration; (3) expert testimony establishes that the property could not be developed in a meaningful fashion, even if clean, given the physical limitations imposed by the remediation wells, monitoring wells, and concrete vapor cap; (4) the property continues to emit toxic vapors which threaten intrusion into structures on the subject property and neighboring properties, suggesting a continuing potential liability for a purchaser and a strong, if not disqualifying, disincentive to purchase the property.
As a result, the court concludes that the approach taken in Inmar, Badische Corp., and Metuchen I would not be useful here. To determine a value for the subject property as if clean in this ease would require an assumption, first, that the property could be cleaned at some point in the foreseeable future. The evidence establishes that the pollution at the subject property is of a type and concentration that the identification of an end date for the remediation process is elusive, if not impossible.
*307 In addition, the discounting-of-remediation-costs approach necessarily would require this court to presume that the ultimate clean-up of the property would include removal of the remediation wells, monitoring wells, and concrete cap. There is nothing in the record to suggest that the DEP contemplates removal of those features at any identifiable point. The court could easily envision a larger parcel of property where contamination is concentrated in an identifiable area while other segments of the parcel, large enough for development, are clean or could be remediated to the point of being open to development without the continuing presence of monitoring wells or other remediation features that present an obstacle to development or use of the property. This is not the ease here. The entire subject property is effectively burdened with contamination and associated remediation features that eliminate its potential for development or use.
Nor would the approach taken in Orient Way be applicable here. The subject property has not been sold through arms’ length negotiations by sophisticated parties. Nor is there evidence here that a willing purchaser would seek to obtain the subject property for redevelopment in the marketplace.
A suggestion was made at trial that the subject property might be amenable to an interim use as a parking lot during the remediation process and should be valued at that use for local property tax purposes. The suggestion, however, was made by counsel. Neither real estate appraisal expert offered the opinion that such an interim use would be either financially feasible or physically possible at the subject. In fact, the municipality’s expert specifically rejected an interim use as a parking lot after examining lease data associated with the board of education parking facility on the adjoining parcel. In addition, no evidence suggests a market-driven need for a parking lot in the area of the subject property.
The approach of the municipality’s expert lacked credibility. As noted above, he offered an opinion of value based on the cost approach. He began his analysis with four comparable land sales. After applying various adjustments he determined a true market *308 value for the subject. He then assumed that the subject property could be fully remediated within seven years. It is not clear from the record the basis for this assumption. To account for the assumed seven-year remediation period, the expert deducted from his opinion of value the local property taxes and municipal utilities costs a purchaser could be expected to pay for the holding period. The expert did not made any adjustment for projected remediation costs, which is directly contrary to the holding in Inmar, supra. See Orient Way, supra, 28 N.J.Tax at 277-78. His opinion, in effect, reflected a value for the subject clean discounted only by the cost of holding the property until it was clean enough to be developed.
In addition, the municipality’s expert failed to account for the existence of the remediation wells, monitoring wells, and concrete cap. He did not opine with respect to when or whether those features could be removed. Nor did he account for the cost of removal, if the DEP’s acquiescence to remove them could be obtained. These are fatal flaws in the expert’s analysis. The taxable true market value of the subject property must account for these patently substantial obstacles to the use or development of the subject property should it ever be deemed clean by the DEP.
The taxpayer’s expert offered the more credible approach. Recognizing the presently indefinite duration of the remediation and monitoring efforts at the subject property, the limited amount of land at the subject not encumbered by remediation equipment or the concrete cap, and the continuing emission from the property of toxic vapors which threaten both the subject and neighboring property, the expert opined that the subject property had no utility on the valuation dates. His opinion is bolstered by the estimated annual cost of $120,000 to $150,000 to maintain the remediation and monitoring wells, which, when coupled with the fact that the property cannot reasonably be expected to be developed in the foreseeable future, renders the property an ongoing financial liability for any purchaser, separate and apart from the continuing threat of liability posed from the continuing emission of vapors at the subject.
*309 The court is convinced that the heretofore recognized approaches for valuing contaminated property for local property tax purposes are of limited utility for determining the true market value of the subject property. In light of the record, and based on a fact-specific analysis, the court concludes that the subject is properly assessed at a nominal value as follows:
Land $1,000
Improvements $L000
Total $2,000
The assessment of real property at a nominal value has been accepted in other contexts. In Village of Ridgewood v. The Bolger Foundation, 104 N.J. 337, 339, 517 A.2d 135 (1986), the Supreme Court examined a property preserved as open space through a private conservation easement, which precluded the owner from removing vegetation, excavating soil, erecting structures, dumping trash, and engaging in any activity that might be detrimental to drainage, flood control, potable water, erosion control, or soil conservation. The municipality assessed the property at a value that reflected its highest and best use for residential development. Ibid. On appeal, the county board of taxation reduced the assessment to a nominal value of $1,000. This court reinstated the higher value, holding that a property owner having voluntarily entered into a conservation easement is not entitled to a reduction in the assessment as a result of that easement. The Appellate Division affirmed. Id. at 339-40, 517 A.2d 135.
The Supreme Court, reversing, made its holding clear:
It is clear that elements of value are surrendered by the taxpayer as an incident to transferring this assurance of preserving open space to the community at large. By giving up in perpetuity the right to do anything with the property other than keep it in its natural state, defendant has, as the County Tax Board found, seriously compromised its value as a marketable commodity. [There is] no doubt that the adverse impact of such an encumbrance on market value must be taken into account in arriving at an assessed valuation.
[Id. at 342, 517 A.2d 135.]
The court reinstated the county board Judgment assessing the property at a nominal amount. Id. at 344, 517 A.2d 135.
*310 A few years earlier in Filcrest Realty, Inc. v. Township of Edison, 2 N.J.Tax 77, 79 (Tax 1980), this court examined property “within the delineated flood hazard area as designated by the Department of Environmental Protection” pursuant to regulation. In determining the true market value of the parcels for local property tax purposes, the court held that it “cannot ignore the impact of regulations issued pursuant to the ‘Flood Hazard Area Control Act’ on the use and hence value of land....” Id. at 81. The court explained that “[p]ertinent regulations prohibit the use of property located in the floodway for all purposes otherwise permitted by Edison’s zoning ordinance.” Id. at 82. “The impact of the flood hazard regulations on the land in the floodway makes it useless for all practical purposes.” Ibid. (citation omitted).
These governmental restriction were the basis of the court’s concise conclusion with respect to assessable value:
I am constrained to find that the plaintiffs property within the floodway has only a minimal or nominal value. As previously noted above, I cannot ignore the impact of flood hazard regulations on the value of lands designated as floodway. I, therefore, find that the value of those lots which lie entirely in the floodway is $200 an acre.
[Id. at 82.]
See also City of Jersey City v. Township of Parsippany-Troy Hills, 16 N.J.Tax 504, 521 (Tax 1997)(noting that the municipality’s “assessment records demonstrate that the lands under all other privately-owned lakes in the Township of Parsippany-Troy Hills have generally been assessed at relatively nominal amounts (based on a fan- market value of approximately $1,500 to $3,000 per acre).”), aff'd, 17 N.J.Tax 538 (App.Div.1998).
Similarly here, DEP regulation of the subject property, pursuant to its statutory authority to oversee the remediation of contamination, severely limits the utility of the parcel. Like the properties in Bolger Foundation and Filcrest Realty, the subject property is subject to restrictions that reduce its true market value to a nominal amount. While the parcel may one day be free from contamination, remediation and monitoring equipment, the concrete cap, and extensive DEP-imposed limitations, that day was not foreseeable for any reasonable market participant on the relevant valuation dates.
*311 It matters not that the subject’s lack of utility is the direct consequence of the property owner’s prior deleterious activities. The property owner in Bolger Foundation voluntarily agreed to imposition of the conservation easement. In addition, all of the property owners or their predecessors in title in Inmar, Badische Corp., Metuchen I and Orient Way, were responsible for the contamination of their property, yet were found to be eligible for a reduction in the assessment on that property. It is the true market value of property, and not the property owner’s responsibility for a diminution in value, that controls here.[1]
The court will enter Judgments in accordance with this opinion.

 The parties concede that the subject property was not in use on the relevant valuation dates. As a result, the holding in Pan Chemical Corp. v. Borough of Hawthorne, 404 N.J.Super. 401, 961 A.2d 1219 (App.Div.), certif. denied, 198 N.J. 473, 968 A.2d 1189 (2009), does not preclude consideration of the effect of contamination on the taxable value of the subject property.